**In re NATIONAL SMELTING OF NEW JERSEY, INC. BONDHOLDERS' LITIGATION.**

Civ. A. No. 84–3199.

United States District Court, D. New Jersey.

June 30, 1989.

See also 695 F.Supp. 796.

Philip B. Seaton, Kozlov, Seaton & Romanini, Cherry Hill, N.J., R. Bruce McNew,

Christopher T. Reyna, Greenfield & Chimicles, Haverford, Pa., for plaintiffs.

William J. Prout, Jr., Tompkins, McGuire & Wachenfeld, Newark, N.J., for defendant Boris Gresov.

Joseph Polino, Mt. Holly, N.J., for defendants Robert Puckett and Edward Puckett.

Kathy M. Hooke, Salvatore T. Alfano, Clapp & Eisenberg, Newark, N.J., for defendant Aaron Holman.

Scott Univer, Arthur Young & Co., New York City, for third-party defendant Arthur Young & Co.

Eileen Lindsay, Pitney, Hardin, Kipp & Szuch, Morristown, N.J., for third-party defendants Windels, Marx, Davies & Ives and James Conroy.

A. Richard Ross, John Gilfillan, III, Carella, Byrne, Bain & Gilfillan, Roseland, N.J., for third-party defendant Michael Thomas.

## OPINION AND ORDER

GERRY, Chief Judge.

As the trial date of this five-year old class action securities case nears, the court is presented with a flurry of last minute motions for summary judgment. To say that this matter has generated substantial motion practice during its long life would be an understatement: we note that the docket sheet compiled by the clerk of the court on this case runs over 30 pages and currently contains 937 entries. There is little need, therefore, for a lengthy recitation of the factual allegations and procedural history of this litigation.

The plaintiff contends, *inter alia*, that the Preliminary Official Statement ("POS") and Official Statement ("OS") issued to prospective bondholders contained misrepresentations and omissions on which they ("the plaintiffs") relied to their injury when the company which received the bond proceeds, National Smelting of New Jersey ("NSNJ"), became insolvent and its assets virtually worthless.

Boiled down, the plaintiffs' central theory of liability is this: the OS and POS implied that much of the bond proceeds— some $3.9 million of a total $6.6 million— were to be used by NSNJ to purchase a lead smelting and refining plant in Pedricktown, New Jersey. (Prior to the purchase, the plant was owned by defendant N.L. Industries, Inc. ("NL").) Thus, prospective investors were led to believe that the plant, which was to secure the bonds, was worth at least $3.9 million. In fact, the plaintiffs charge, the plant was worth substantially less than $3.9 million, and the purchase price covered not only the acquisition of the plant but the relinquishing, by NL, of obligations owed NL by NSNJ's parent company National Smelting & Refining ("NSR") and by the Standard Metals Corporation ("SMC"), which owned 50% of NSR. The plaintiffs further claim that the OS failed to disclose information which tended to show that the plant was worth less than $3.9 million and additionally failed to describe the "other transactions" which were funded by the $3.9 million.

After being pared down by motion practice and other developments,[1] the list of defendants currently include Boris Gresov, CEO and Chairman of the Board of Standard Metals Corporation and Director of NSR; Robert L. Puckett, CEO and Director of NSR and NSNJ; Edward L. Puckett, Vice President and Director of NSR and NSNJ; and Aaron Holman, Treasurer of SMC and Director of NSR.

Gresov has filed a third-party complaint against Arthur Young & Company who served as certified public accountants to NSNJ and independent outside auditors to NSR; and Michael Thomas, general partner of Standard Ventures Limited Partnership ("SVLP"), which (according to the OS) acted as an "acquisition advisor" on the Pedricktown deal.

---

1. Alston and Bird, legal counsel to the underwriter of the bond offering, reached a settlement with the plaintiff class. After a settlement hearing, this court accepted the settlement on April 25, 1989.

In addition, Holman has impleaded the law firm of Windels, Marx, Davies & Ives and James P. Conroy, Esq. (a member of the Windels firm). Windels and Conroy acted as legal counsel to SMC.

Presently before us are motions for summary judgment on behalf of defendants Holman and the Pucketts. Also, third-party defendants Arthur Young & Company, Michael Thomas and Windels and Conroy seek summary judgment on the third-party complaints of Gresov and Holman, respectively. Finally, defendant Gresov and third-party defendants Conroy and Windels urge dismissal of Alston and Birds' claim for contribution against them which, by the terms of settlement between Alston & Bird and the plaintiff class, has been assigned to the plaintiffs.

*Legal Analysis*

Summary judgment may be granted only when the record shows that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. *Hersh v. Allen Products Co.*, 789 F.2d 230, 232 (3d Cir.1986).

A genuine issue of material fact is created where the non-moving party adduces sufficient evidence in opposition to a motion against him to support a reasonable jury verdict in his favor. *Id.* at 248, 211–212. In evaluating whether he has met his burden, the evidence is viewed in the light most favorable to the non-moving party. *White v. Westinghouse Electric*, 862 F.2d 56, 59 (3d Cir.1988), (rehearing den. Jan. 5, 1989). The allegations of the non-moving party are accepted as true, and any conflicts are resolved in his favor. *Id., citing Gans v. Mundy*, 762 F.2d 338, 340 (3d Cir.), *cert. denied*, 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985). Inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party. *Id.* However, when faced with a properly presented motion for summary judgment, the non-moving party is required "to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celo-*

*tex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

Similarly, with regard to the motions to dismiss, "the accepted rule [is] that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

With these principles in mind, we discuss the motions before us *seriatim.*

I. *Defendant Holman's Motion for Summary Judgment*

A. Statute of Limitations

Defendant Holman's first argument in support of his motion for summary judgment is based on the Third Circuit Court of Appeal's *en banc* decision in *In re Data Access Systems Securities Litigation*, 843 F.2d 1537 (3d Cir.) (*en banc*), *cert. denied sub. nom, Vitriella v. I. Kahlowsky*, —— U.S. ——, 109 S.Ct. 131, 102 L.Ed.2d 103 (1988). Abandoning the frustrating and tedious procedure of adopting the most analogous state statute of limitations period and applying it to claims under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), the Third Circuit held that "the proper period of limitations for a complaint charging violation of section 10(b) and Rule 10b–5 is one year after the plaintiff discovers the facts constituting the violation and in no event more than three years after such violation." *Id.* at 1550 (the "one-three rule").

Holman contends that the plaintiffs were aware of the facts upon which they based their claim against him at least as early as April 30, 1984, approximately 15 months before plaintiff's July 19, 1985 complaint naming Holman as a defendant. Therefore, if we apply *Data Access* retroactively, as Holman insists we must, the plaintiff class's claims are time-barred.

To resolve this issue, we must answer essentially two questions. First, should *Data Access* apply retroactively in the context of this case? Second, at what point

did or should the plaintiff class have possessed such facts about Holman's potential culpability as to trigger the running of the statute of limitations?

Our answer to the first question depends on the application of three factors articulated by the Supreme Court in *Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). These factors are premised on a general assumption that judicial decisions should apply retroactively. To apply *Data Access* non-retroactively under the *Chevron* test:

> (1) its holding must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed;

> (2) we must weigh the merits and demerits of this case by looking to the history of the rule in dispute, its purpose and effect, and whether retrospective operation will further or retard the rule's operation; and

> (3) retrospective application of *Data Access* must create the risk of producing substantially inequitable results.

*Chevron Oil Co.*, 404 U.S. at 106–107, 92 S.Ct. at 355–56; *Hill v. Equitable Trust Co.*, 851 F.2d 691, 696 (3d Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 791, 102 L.Ed.2d 782.

Defendant Holman insists that our task is a simple one in light of the decision of a panel of the Third Circuit in *Hill*. Holman argues that *Hill* stands firmly for the proposition that *Data Access* did not overrule clear precedent upon which § 10(b) plaintiffs could have reasonably relied, and therefore we must find that the first *Chevron* factor counsels against non-retroactive application of *Data Access* here. Unfortunately for Holman, we do not read *Hill* as standing for such a broad proposition.

*Hill* involved an appeal by a group of Maryland resident plaintiffs whose § 10(b) claims were dismissed as time-barred. Referring to Delaware's borrowing statute,

Senior District Judge Latchum had determined that Maryland law provided the applicable statute of limitations to be applied to the Maryland plaintiffs' claims, and that the Maryland Blue Sky Law was the Maryland state law most analogous to the plaintiff's § 10(b) claim.[2]

Since the Maryland Blue Sky Law contained a 1–3 rule (like that later adopted in *Data Access*) and the transactions underlying the plaintiffs' claims occurred more than three years before the plaintiffs filed their action, their lawsuit was barred.

On appeal, the Maryland plaintiffs attacked the district court's application of the Maryland Blue Sky Law's statute of limitations, arguing that Delaware's general fraud law's limitations period should have been applied. The Third Circuit dealt with the appeal as primarily raising the question of whether in the context of that case, *Data Access*, which had been decided after the district court's decision, should be given retrospective application. Applying the three *Chevron* factors, the court answered affirmatively.

The court's decision turned on its analysis of the first and third *Chevron* factors, which are closely related. With respect to the first factor, the court noted that the state of the law on two dates was pertinent—the date on which the plaintiffs were aware of the possibility that they had a claim, June 1979, and the date on which they filed their complaint in April of 1982, some two years and ten months later. *Hill*, 851 F.2d at 697. At each time, the court determined that the law of the circuit was uncertain as to the statute of limitations to be applied to § 10(b) claims. *Id.* at 697–698. In so ruling, however, the court stressed the differences between various judges on the circuit with regard to whether state general fraud laws or blue sky laws should provide the statute of limitations for particular § 10(b) claims. *Id.* at 697, *discussing Roberts v. Magnetic Metals Co.*, 611 F.2d 450 (3d Cir.1979) and *Biggans v. Bache Halsey Stuart Shields*,

---

**2.** Judge Latchum applied Delaware's general fraud statute, which had a three-year time limitation, to the claims of the Delaware plaintiffs.

Whether *Data Access* should apply retroactively to those plaintiffs' claims was not an issue before the Court of Appeals.

*Inc.*, 638 F.2d 605 (3d Cir.1980). As *Data Access* makes clear, the prior approach of looking for the most analogous state law statute of limitations was unwieldy and unpredictable, with various circuit and district judges placing different emphases on furthering states' policies of repose as opposed to the federal interests underlying § 10(b), and giving varying weight to whether a state's blue sky law provided a remedy for the behavior complained of by the plaintiff and whether the blue sky law was enacted to supplement rather than supplant existing common law remedies. It was this uncertainty as to which state statute would apply which was relevant to the *Hill* court's holding that the Maryland plaintiffs had no clear precedent upon which to rely in waiting to file their lawsuit, *since the plaintiffs were complaining that the district court selected the wrong state statute of limitations.* The law in this circuit was crystal clear prior to *Data Access* insofar as it indicated that district courts were bound to apply the state limitations law most analogous to a particular plaintiff's § 10(b) claim. But this could be of no solace to the Maryland plaintiffs in *Hill* because a potentially applicable state statute, in fact the one applied by the district court, was identical to the 1–3 rule articulated in *Data Access.*

In fact, the *Hill* court relied on this identity in finding that there was no inequity in applying *Data Access* retroactively, the third *Chevron* inquiry. *Hill*, 851 F.2d at 698. Indeed, given the existing case law, the court indicated that the district court's application of Maryland's Blue Sky Law "should not have been unexpected." *Id.* at 698.

Coupled with its assumption that resolution of the second *Chevron* factor—whether retrospective operation would further or retard *Data Access*'s ruling—was neutral, the court's analysis of the first and third *Chevron* factors impelled it to give retroactive effect to *Data Access.* An application of the *Chevron* factors here, however, counsels a different outcome.

We start with the first factor. Though there perhaps was some uncertainty on April 30, 1984, the date on which the plaintiffs allegedly had the basic facts underlying their complaint against Holman, and July 19, 1985, the date of the amended complaint adding Holman as a defendant, as to whether the New Jersey Blue Sky Law's statute of limitations, N.J.S.A. 49:3–71(e) (1985), or the six-year limitation applicable to common law fraud actions in New Jersey, N.J.S.A. 2A:14–1, would apply to plaintiff's § 10(b) claims, there was absolutely no doubt that some state limitations period would be applied. Whatever differences might have existed among the judges of our circuit court, all agreed that their task, prior to *Data Access*, was to find and apply the most analogous state law statute of limitations. *Hill*, 851 F.2d at 695 (prior to *Data Access*, Third Circuit "decisional law required application of the most analogous state limitations statute comporting with the policy behind section 10(b) and Rule 10(b)(5)"). *Data Access*, 843 F.2d at 1541, 1553 (majority and dissenting opinions, respectively); *Sharp v. Coopers & Lybrand*, 649 F.2d 175, 191 (3d Cir.1981), *cert. denied*, 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982); *Biggans*, 638 F.2d at 607, 611 (majority and dissenting opinions, respectively); *Roberts v. Magnetic Metals Co.*, 611 F.2d at 452, 456, 461 (*concurring* opinions of Gibbons, J., Sloviter, J., and *dissenting* opinion of Seitz, J., respectively).

In the case *sub judice*, it appears that plaintiffs filed their complaint well within either of the two state limitations periods which would have been potentially applicable prior to *Data Access.* When this is the situation, we believe that *Data Access* is appropriately seen as overruling clear past precedent upon which plaintiffs could have reasonably relied. By timely filing a complaint which satisfied any potentially applicable state statute, plaintiffs relied on the only universally agreed upon principle prior to *Data Access*—that the courts would apply the most analogous limitation period referenced by the law of the forum state.

Defendant Holman himself seems to have recognized this bottom-line certainty, since this is the first time he has raised a statute of limitations argument by way of

motion practice. Moreover, he does not contend that New Jersey would apply the limitations law of another state to this dispute. As this is the record before us, we will not speculate on what other state's limitations law might be applicable to this class action, especially since none suggests itself. *Sharp,* 649 F.2d at 192, n. 24.[3] In sum, we believe that the plaintiffs were entitled to rely upon the clear precedent of the circuit that an analogous state limitations period would be applied. As such, the first *Chevron* factor favors non-retrospective application of *Data Access* here. In so deciding, we acknowledge the existence of numerous decisions by other district courts in this circuit holding that there was no certain precedent upon which plaintiffs could reasonably rely in waiting to file a § 10(b) claim. To the extent that these cases involve plaintiffs who did not timely file under both of the potentially applicable state statutes of limitations, they are distinguishable on the same ground as *Hill. See Prospect Purchasing Co. v. Weber, Lipshie & Co.,* 694 F.Supp. 1149, 1156 n. 13 ("the issue of uncertainty [does] not concern the question of whether to apply the federal or state statute of limitations, but rather which state statute to apply"); *McCarter v. Mitcham,* 693 F.Supp. 349, 352 (W.D.Pa.1988). To the extent that the decisions rested on an application of *Hill* without discussion of whether the uncertainty relevant in *Hill* was relevant in the case at bar, we respectfully decline to follow their approach. *See, e.g., Schwartz v.*

*Philadelphia National Bank,* 701 F.Supp. 92 (E.D.Pa.1988); *Bradford–White Corp. v. Ernst & Whinney,* 1987 WL 16316 *rev'd Bradford–White Corp. v. Ernst & Whinney,* 872 F.2d 1153 (3d Cir.1989); *Adelaar v. Lauxmont Farms, Inc.,* 695 F.Supp. 821 (M.D.Pa.1988).[4] And, of course, not all district courts have given retroactive effect to *Data Access. Gruber v. Price Waterhouse,* 697 F.Supp. 859 (E.D.Pa.1988); *ITG, Inc. v. Price Waterhouse,* 697 F.Supp. 867 (E.D.Pa.1988); *Newfield v. Shearson Lehman Bros.,* 699 F.Supp. 1124, 1126 (E.D. Pa.1988) (refusing to apply *Data Access* retroactively, not because of an analysis of the *Chevron* factors, but because to do so would be "unfair").[5]

Turning to the second *Chevron* factor— whether retroactive application here will further or retard the rule articulated in *Data Access*—there is no reason to believe that retroactive application would either further or hinder the new rule's function. Indeed, there is nothing before us to distinguish *Hill'*s assumption of neutrality as to the second *Chevron* criteria. *Hill,* 851 F.2d at 698.

The final *Chevron* factor focuses on whether retrospective application would create the risk of producing substantially inequitable results. "In practice, this consideration overlaps with that of the first factor, in that it would be inequitable to give retrospective application to a shortening of the limitations period that altered established law upon which plaintiff could

---

**3.** Nor are we anxious to engage in an unnecessary application of the choice of law principles articulated in *Heavner v. Uniroyal, Inc.,* 63 N.J. 130, 305 A.2d 412 (1973). The general rule in New Jersey is, after all, that the "rule of the forum determines the applicable period of limitations." *O'Keefe v. Snyder,* 83 N.J. 478, 416 A.2d 862, 868 (1980).

**4.** We have read but decline to cite various unpublished decisions brought to our attention by the parties. Keeping abreast of the published case law is difficult enough for courts and litigants, so we need not go further and utilize decisions not necessarily intended to be persuasive authority. Indeed, this court has given retroactive effect to *Data Access* in an unpublished opinion in *Laven v. Price Waterhouse,* C.A. 88–380. In *Laven,* we dismissed a complaint on the basis of *Data Access.* Distinguish-

ing *Laven* from our present case are several factors including: (1) the presence of a § 11 Securities Act claim which already required filing within the 1–3 rule later adopted by *Data Access;* (2) the fact that it was uncertain as to whether the plaintiffs had filed within both the potentially applicable state statute of limitations; and (3) the presence of extremely strong evidence that the plaintiffs should have, in the exercise of reasonable diligence, known that they had a claim against Price Waterhouse for *at least* a year prior to the effective date of a tolling agreement between the parties.

**5.** And in *Data Access* itself, of course, Judges Seitz, Sloviter and Mansmann indicated, in dissent, that the case, in their view, "clearly overturns past circuit precedent...." 843 F.2d at 1553.

have reasonably relied." *Fitzgerald v. Larson,* 769 F.2d 160, 164 (3d Cir.1985). Given our finding on the first *Chevron* factor, we can, without saying much more, indicate our belief that it would be inequitable to apply *Data Access* to bar the plaintiffs' claims against defendant Holman. This is especially so where defendant Holman moved for summary judgment on this ground over a year after the Third Circuit's decision in *Data Access,*[6] and the plaintiffs have litigated this issue for five years at great expense and effort.

Therefore, finding that application of *Chevron* counsels non-retrospectivity, we answer our first question in the negative and deny defendants' summary judgment motion insofar as it rests on the application of *Data Access* to the case before us.

■ As to the second question, i.e., what point in time was the statute of limitations triggered with respect to plaintiffs' claims against Holman, the record before us is such that we cannot hazard an answer. Hence, even were we to give *Data Access* retrospective effect we would deny Holman's motion on this ground. Though Holman argues that April 30, 1984 is the date plaintiffs discovered the basis for their claim against Holman, the record evidence cited by Holman does not persuade us that this is so.[7] Nowhere in the exhibits pointed to by Holman is there a discussion of the all important "other transactions." While there was information available to plaintiffs on April 30, 1984 which suggested that the Pedricktown plant was worth less than $3.9 million, and that the costs of cleaning up the plant site, from an environmental standpoint, were large, we are unable to conclude that, as a matter of law, on April 30, 1984 a reasonably diligent plaintiff would have known there was a basis for a claim against Holman on this

inchoate information,[8] though the evidence before us is such that we can perhaps say that the plaintiffs were on "inquiry notice" as of April 30, 1984, *Gruber,* 697 F.Supp. at 864. We will deny Holman's motion with respect to plaintiffs' § 20(a) Exchange Act claim and plaintiffs' § 15 Securities Act claim, since Holman's attempt is premised on our finding, as a matter of law, that April 30, 1984 has the significance he assigns to it. Defendant Holman, of course, remains free to and should submit proposed jury interrogatories so that the essentially factual determination of when the statute of limitations began to run on plaintiffs' claims may be made. And plaintiffs are warned that they must be prepared to do more than say that they did not possess the facts upon which their claim was based on a particular date; rather, they will be expected to produce evidence of their efforts at uncovering the alleged fraud and of the date on which they discovered the evidence underlying the complaint. Defendant Gresov's tag-along statute of limitations argument is denied.

**B. § 10(b) Primary Liability ***

■ Defendant Holman also moves for summary judgment on the ground that the plaintiffs have failed to produce evidence sufficient to create a material dispute of fact with respect to whether Holman had the requisite state of mind to trigger § 10(b) liability. Under § 10(b), plaintiffs bear the burden, at trial, of demonstrating that the defendants acted with scienter, "a mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976). Within the Third Circuit, the scienter requirement may be satisfied by a showing

---

**6.** And only after the court established a deadline for the filing of dispositive motions.

**7.** We note that for purposes of equitable tolling, this is the applicable test after *Data Access* as it was under the previously prevailing analysis. *See Biggans,* 638 F.2d at 607, n. 3.

**8.** Moreover, plaintiffs' July 19, 1985 complaint was, seemingly, filed well within the absolute three-year bar established by *Data Access* since

the official statement which accompanied the Bond Offering is dated February 22, 1983. Hooke Certification, Exhibit A. On the record here, we are unable to conclude that either the "1" or the "3" in the 1–3 rule of *Data Access* compels holding these claims to be time-barred.

* In this opinion, § 10(b) is to be understood as referring to a Rule 10b–5 action.

of recklessness. *See e.g., Eisenberg v. Gagnon,* 766 F.2d 770, 776 (3d Cir.), *cert. denied, Weinstein v. Eisenberg,* 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985); *Healey v. Catalyst Recovery of Pennsylvania, Inc.,* 616 F.2d 641, 649 (3d Cir.1980); *MacLean v. Alexander,* 599 F.2d 1190, 1197–98 (3d Cir.1979); *Coleco Industries, Inc. v. Berman,* 567 F.2d 569, 574 (3d Cir. 1977), *cert. denied,* 439 U.S. 998, 99 S.Ct. 601, 58 L.Ed.2d 671 (1978). A jury may find that a defendant in the § 10(b) context has acted recklessly if his conduct constitutes "an extreme departure from the standards of ordinary care, ... which presents a danger of misleading ... that is either known to the defendant or is so obvious that the actor must have been aware of it." *Healey,* 616 F.2d at 649, *quoting Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033, 1045 (7th Cir.) *cert. denied,* 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977). This standard's application is troublesome because in the § 10(b) context negligence, gross negligence and recklessness do not bleed into one another. Rather, recklessness in this context requires conduct "relatively close to intentional conduct." *Healey,* 616 F.2d at 649; *MacLean,* 599 F.2d at 1198 ("negligence—whether gross, grave or inexcusable—cannot serve as a substitute for scienter."); *Sundstrand,* 553 F.2d at 1045 ("recklessness should be viewed as the functional equivalent of intent").

As we have previously noted, "summary judgment is generally inappropriate for issues of state of mind, knowledge and intent," Op., 12/14/87 at 10; however, Holman insists that the record before us is such that summary judgment in his favor is mandated. And as we have recently noted, "recent precedent suggests that summary judgment can be granted if plaintiff fails to present credible evidence of scienter." *Laven v. Flanagan,* 695 F.Supp. 800, 812 (D.N.J.1988) (citing cases). "Plaintiffs must do more than simply attack defendants' affidavits as self-serving and argue that a jury could choose to disbelieve them without offering any evidence that would provide a basis for such belief." *Id.* (quotes omitted).

Holman primarily relies on his own certification as the factual basis for his motion, and the following is asserted therein. When the bonds were issued on February 22, 1983, Holman was a Director of Standard Metals, NSR and NSNJ. Holman, Cert., ¶ 2. Holman also was in-house counsel to and Secretary–Treasurer of Standard Metals. *Id.*

Holman insists that his role in the purchase of the Pedricktown plant (and the bond issue in particular) was limited. In late 1982 and 1983, Holman knew that NSR was planning to buy the Pedricktown plant, and that it would do so by forming NSNJ, which would be wholly owned by NSR. *Id.* ¶ 7. Holman did not, however, participate in the negotiations among NSR, NL and Standard Metals leading to the sale. *Id.* Later, Holman learned that the acquisition of the plant would be financed by a $6,000,000 bond issue but insists that he "did not initiate the concept of the bond financing or participate in any of the negotiations or structuring which led up to the financing." *Id.* ¶ 8. Holman alleges that he had no knowledge of any misrepresentations and/or omissions in the Official Statement, did not participate in the drafting of the POS or OS, was unaware of any scheme to omit material information from the POS and OS, and at no time was aware of or participated in any wrongdoing. *Id.* ¶ 6, 9.

Though he admits he voted as a member of the NSNJ Board to pass the resolutions which authorized the plant purchase and the bond issue, he did so in the belief that the purchase price was fair, that the Pedricktown facility's operation would generate revenues sufficient to redeem the bonds and that "all necessary and full disclosure had been made in the documents presented to potential bondholders in connection with the issuance of the bonds." *Id.* ¶ 10, 12. In coming to this conclusion, Holman says he relied on information about the proposed purchase and the issuance of the bonds given to him by James Conroy and Boris Gresov. *Id.* ¶ 12.

In his certification, Holman addressed three areas in which the plaintiff class alleges the OS and POS were materially mis-

leading. First, with regard to the plaintiffs' allegations that the OS/POS led the purchasers to believe that the market value of the plant was equal to or greater than $3.9 million, Holman says that he thought this was a fair price for the plant. He based this belief on a Machinery and Equipment Appraisal by Aaron Equipment Company dated February 4 and 5, 1981, and a property appraisal by Carroll–McIlhinney dated January 13, 1982, which he, in good faith, believed "reflected a fair and accurate value for the plant and its equipment." *Id.* ¶ 14(a). Holman knew of no plan to mislead potential buyers as to the value of the plant, nor was he aware that NL had failed to locate other potential buyers for the Pedricktown plant. *Id.* ¶ 14(a), (b). Holman did not know that NSNJ was assuming responsibility for any environmental problems at Pedricktown; he thought that NL would resolve any such problems prior to the purchase and therefore was, presumably, not involved in any attempt to mislead potential bond buyers as to the extent of NSNJ's assumed responsibilities. *Id.* ¶ 14(d). In sum, Holman says he was but a bit player in this play who relied on leading men Gresov and Conroy to provide him with information about the transaction and "to structure the transaction and bring it to a successful completion ... *in full compliance with applicable laws.*" *Id.* ¶ 15 (emphasis added).

The record before us demonstrates the difficulty of resolving issues of state of mind by way of summary judgment practice. For despite Holman's certification, this court has great difficulty in determining the state of mind with which he acted. Holman insists that he acted in good faith, and that he played a limited role in approving the Standard Metals/NSR/NSNJ–NL deal and had no role in preparing or reviewing the POS/OS. Unfortunately, a review of Holman's deposition testimony indicates that his certification contains assertions different, in various degrees, from his previous sworn testimony.

Since Holman specifically addressed three particular areas of concerns in his certificate, a comparison of his deposition testimony on those subjects usefully illustrates our concern. First, as to valuation, Holman deposed that he never participated in a discussion of the plant price but relied on the Aaron appraisal in deciding that it was a good price. Holman Dep. 8/9/88 at 63. This reliance is somewhat dubious in light of his additional testimony that he was not certain that he saw the appraisal prior to the completion of the Pedricktown purchase. *Id.* And contrary to his certification which indicates that he relied on a property appraisal by Carroll–McIlhinney as supporting his belief that the sale price was a fair representation of the plant's value, at his deposition Holman said that he reviewed *no* other documents related to the price of the plant and was unaware of any experts other than Aaron who were consulted with respect to the transaction. *Id.* at 64–65.

Second, though Holman denies seeking to conceal the relationship of the other transactions to the plant purchase, he was present at a December 30, 1982 NSNJ Board of Directors meeting where the Board approved the Standard Metals/NSR/NSNJ–NL deal in its entirety, including the side agreements about which he contends he had no detailed knowledge. Rodriguez Certification Exhibit A; Holman Dep. at 46. At his deposition, Holman could not recall who was present at the meeting, if any agreements were signed, or what happened at the meeting. Holman Dep. at 47. And at deposition, Holman's diary, which he admitted was in his handwriting, was used as an examination aid. Holman was asked about a December 31, 1982 entry in the diary which indicated that Conroy had received a $500,000 check from NL for Standard Metals. *Id.* at 48. Holman did not know what the check was for and could "only guess" at whether the $500,000 was paid to Standard Metals by NL as part of the Pedricktown purchase. *Id.* at 49. Other diary entries indicate that Holman was asked on January 12, 1983 to review contracts "in the NL/NSR/Standard matter," and in February 1983 *"to meet with [Gresov] and Conroy ... for final reviewing of contracts and industrial revenue bond."* *Id.* at 57. As for the

environmental issue, Holman now says he was aware of environmental problems at the Pedricktown plant but thought NL would resolve them; at his deposition, Holman denied having knowledge of any environmental problems at the time the plant was acquired. *Id.* at 71.

Finally, though Holman's deposition testimony is replete with statements that he relied on Gresov and Conroy to structure the deal, nothing in Holman's testimony indicates that Conroy advised him as to the adequacy of the disclosures made in the POS/OS. Indeed, Holman indicated that he had never seen the OS *prior to the deposition,* and he was very unclear as to whether he ever received advice from Conroy, legal or otherwise, other than at one meeting of the Standard Metals Board. *Id.* at 76–8. In fact, Holman deposed that Conroy did not give advice as to the form of documents but only advised the Board to approve the Standard Metals/NSR/NSNJ–NL transactions. *Id.* at 78. And whatever presentation Conroy made was, according to Holman, extremely brief. *Id.* at 68.

In addition to Holman's version of events, the record also contains an affidavit by Conroy in which he denies summarizing the transactions to the NSR or NSNJ Boards or recommending their approval. Conroy Affidavit ¶ 9. Most importantly, Conroy insists that he had no involvement in the drafting of the POS and only a minor involvement with the drafting of the OS, and was never asked to draft nor did he or his firm draft or participate in drafting those parts of the POS/OS "which described the structure of the financial transaction by which the plant was purchased from NL." *Id.* ¶ 13. Such averments constitute an implicit denial that Conroy undertook, on behalf of the NSNJ Board, to ensure that the OS was adequate.[9]

The record is such that we believe only a jury may appropriately determine whether Holman acted recklessly. His deposition testimony is a virtual litany of such phrases as "I don't recall" and "I relied on...." Such a complete lack of recall, in our view,

makes doubtful Holman's confident assertions of good faith.

The record indicates that Holman voted as a member of the Standard Metals and NSNJ Boards to approve the "other transactions" and therefore knew that the $3.9 million purchase price was contingent upon NL's excusal of a $1.5 million debt owed by Standard Metals—*a debt over one-third of the purported purchase price.* The record also suggests that Holman took no steps to make sure that this fact was adequately disclosed to the bond-buying public. This may be because this was not a role he was to play in this transaction since Conroy and Gresov were supposed to be taking care of it. But Conroy's affidavit makes it impossible for the court to say this is so.

In addition, Holman says he never reviewed the OS, he never asked questions about it, and never received legal advice about the adequacy of the disclosures. But his own diary indicates that in February of 1989, he reviewed documents related to the bond issue. Holman Dep. at 57.

Given this fact, and Conroy's denial that he provided legal advice to Holman, a jury could believe that Holman is not being entirely candid about his role. Further, Holman was a director of the company which approved the OS, and *in-house counsel and long-time director to the company which was the direct beneficiary of the other transactions.* Someone in his position may, by totally abdicating any responsibility to ensure that the Official Statement was materially complete, potentially be liable under § 10(b) and Rule 10(b)(5). That is, even if Holman did not have actual knowledge of any misrepresentations in the OS, he could still have the necessary scienter if the plaintiffs establish that "his failure to discover the misrepresentations amounted to a willful, deliberate, or reckless disregard for the truth that is the equivalent of knowledge." *Rochez Bros., Inc. v. Rhoades,* 491 F.2d 402 (3d Cir.1974), *quoting Lanza v. Drexel & Co.,* 479 F.2d 1277, 1305 (2d Cir.1973). There is sufficient evidence to support a jury finding

---

**9.** We are also somewhat at a disadvantage at this point because Conroy has not yet been

deposed. His deposition may be held within the next few weeks.

that Holman knew that the purchase price of $3.9 million did not of itself represent the real value of the plant in the context of the overall deal and lacked a genuine belief that the disclosures contained in the POS/OS were adequate and not materially misleading, since the jury could find that Holman had nothing upon which to base such a belief.

Furthermore, the inconsistencies contained in Holman's sworn submissions and the Conroy–Holman dispute raise questions of credibility bearing on Holman's state of mind. These are more appropriately resolved by a carefully instructed jury than by a court upon a paper record. While courts may not merely disbelieve a defendant's affidavit because the plaintiff wishes it to do so, the vagueness and inconsistency of defendant Holman's memory could rationally lead a jury to conclude that he is being intentionally evasive about his role with respect to the other transactions and the bond offering.[10] And when a moving party attempts to escape liability by pointing his finger at others, we must allow the jury to determine who played what role rather than choose between two contending affidavits. We cannot, as Holman would have us do, rely on "a reasonable inference" that Conroy's presence at SMC, NSR and NSNJ Board meetings means "that those Boards were seeking counsel's advice about the legality of the contemplated action," Holman's Reply Brief at 13, especially when Conroy denies playing this role.

In sum, we will deny Holman's motion. In so doing, we wish to reemphasize that we are cognizant of the difficulties and dangers of predicating a finding of scienter solely on inaction. Mr. Holman may rest assured that the jury will be carefully instructed, that he may not be found liable under § 10(b) for merely negligent conduct; i.e., conduct which is objectively unreasonable, but only if his conduct is found to be reckless, i.e., to constitute an extreme departure from standards of ordinary care so extreme that it created a danger of misleading potential bond purchasers so obvious that *Holman must have been aware of it.*[11] We suggest that both the plaintiff class and defendant Holman focus attention on the legal principles upon which the court will have to charge the jury with respect to Mr. Holman's state of mind, and especially upon the possibility of grounding a finding of recklessness upon a director's inaction.

## C. Controlling Persons Liability

■ Holman also seeks summary judgment on count two of plaintiff's complaint. These counts allege that Holman violated § 15 of the Securities Act and § 20 of the Securities Exchange Act. Section 15 of the Securities Act of 1933, 15 U.S.C. § 77o, provides that:

> Every person who, by or through stock ownership, agency or otherwise, or who pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock, ownership, agency or otherwise, controls any person liable under section 11 [15 USCS § 77k] or 12 [15 USCS § 77l], shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom

---

**10.** A rational jury could also view his testimony as the product of a witness's good-faith effort to remember past incidents or events in which he had little involvement.

It is the jury's role to determine which state of mind obtained. For, as Judge Wright has aptly noted:

> The findings which must be made under the *Sundstrand* test are particularly suited for decision by the trier of fact. Whether an omission is "highly unreasonable", and whether an omission presented a danger of misleading investors that was so obvious that a defendant must have been aware of it, are matters which depend largely on an evaluation of the factual

context of a case and an evaluation of what a reasonable person could be expected to do. The record in this case is not so clear on these matters that the Court can find either recklessness or lack of it as a matter of law under the *Sundstrand* test. A jury is particularly suited to make this type of evaluation.

*Valente v. Pepsico, Inc.,* 454 F.Supp. 1228, 1251 (D.Del.1978).

**11.** And we will, of course, not hesitate to grant a directed verdict or a judgment notwithstanding the verdict if the testimony at trial dictates such action.

such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

Section 20 of the Securities Exchange Act, 15 U.S.C. § 78t, provides:

Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

Holman makes a three-pronged attack on the plaintiffs' controlling person claims, arguing (1) that there is no record evidence which could support a jury finding that Holman is a controlling person; (2) that plaintiff has made no showing that Holman was a culpable participant in a securities law violation; and (3) that Holman has established a statutory defense of good faith. We deal with these contentions in the order they were raised by Holman.

Holman insists that he was not a controlling person of NSNJ, NSR or Standard Metals since he was merely a director, had no day-to-day management responsibilities, and "was uninvolved in the particular transactions giving rise to the Amended Complaint." Holman's Brief in Support of Summary Judgment at 26.

This court has recently dealt with the issue of control liability in *Laven*, wherein we said:

The standards to be used in determining whether a defendant is a "controlling person" under section 15 or section 20 are the same. *Pharo v. Smith*, 621 F.2d 656, 673 (5th Cir.1980). *Securities and Exchange Commission v. Management Dynamics, Inc.*, 515 F.2d 801, 812 (2d Cir.1975). The Securities and Exchange Commission has defined "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities by contract, or otherwise." 17 C.F.R. § 240.12b.2 *cited in Rochez Brothers, Inc. v. Rhoades*, 527 F.2d 880, 890 (3d Cir.1975). The Third Circuit has stated that "[i]n making this determination, the courts have given heavy consideration to the power or potential power to control ... as opposed to the actual exercise thereof." *Rochez* at 890–91.

695 F.Supp. at 806–07.

Plaintiffs contend that several pieces of record evidence raise an issue of fact as to Holman's status as a controlling person. First, it is uncontested that Holman served on the Boards of SMC, a 51% shareholder of NSR, NSR, which wholly owned NSNJ, and NSNJ itself. In addition, he was in-house counsel to SMC, as well as its Secretary–Treasurer. Second, Edward Puckett has deposed that Holman was part of a three-person control group (consisting of the NSNJ Board members who sat on NSNJ's Board) which controlled NSNJ. E. Puckett Deposition of December 18, 1985 at 8–10. Third, plaintiffs have produced record evidence which demonstrates that Holman voted to approve the SMC/NSR/NSNJ–NL transactions. These transactions resulted in a benefit, or so the evidence suggests, of $1.5 million to SMC, a corporation Holman served as counsel, officer and director. In light of his possession and use of a vote with respect to these transactions, his potential role as part of a SMC control group, and his status as one director on a small five member Board, we believe that there is evidence to support a finding that Holman had the "potential power" to control these transactions.

As for culpable participation and good faith, we rely primarily on our previous discussion of Holman's state of mind. We pause only to remind the plaintiffs of the burden they bear at trial. They will have to prove, to achieve relief under count two, that Holman was a "culpable participant" in a fraud committed by NSNJ. *Rochez Brothers, Inc. v. Rhoades*, 527 F.2d 880, 890 (3d Cir.1975); *Laven*, 695 F.Supp. at

809. This will require an even greater showing than is necessary to establish scienter for § 10(b) purposes. The plaintiff class has not produced record evidence suggesting that Holman himself drafted the OS or played a key role in shaping its contents. Rather, the plaintiff class has pointed to evidence which indicates that Holman took no steps to ensure that the OS was not deficient or misleading in some material respect with regard to the value of the Pedricktown plant, the "other transactions," and the extent of the environmental obligations NSNJ would assume upon purchase. We put the plaintiff class on notice that if it intends to premise its controlling persons liability theory on Holman's inaction or neglect, the class "must prove that the inaction was deliberate and done intentionally to further the fraud." *Sharp,* 649 F.2d at 185; *Laven,* 695 F.Supp. at 809. The record before us leaves us with grave doubts as to the plaintiffs' ability to sustain this burden at trial. Our refusal to grant summary judgment flows only from our inability to and the impropriety of determining the scienter with which Holman acted from the erratic record we possess.

This record also counsels refusal of Holman's good faith defense. This defense rests on Holman's asserted good faith belief that all necessary disclosures had been made, that $3.9 million represented a fair value for the Pedricktown plant, and that he had no reason to believe that factual misstatements and/or misleading statements were being made. It may very well be that Holman acted in good faith. But since Holman's averments of good faith are based on (1) his reliance on Conroy (who avers that he did not provide Holman with advice upon which to be relied); (2) appraisals which Holman may not have read until after the OS was sent to bondholders; and (3) a memory so vague as to be potentially the product of something other than the mere passage of time, we cannot accept the proposition that good faith has been established as a matter of law. We deny Holman's motion for summary judgment on

count two. Holman also seeks summary judgment on the state law claims against him. This attempt was predicated on his prevailing on his motion with respect to the federal law claims, and so must be denied with them.

II. *The Pucketts' Motion for Summary Judgment*

Defendants Robert L. Puckett and Edward L. Puckett have filed a joint motion for summary judgment seeking dismissal of the plaintiffs' claims against them. The Pucketts contend that the plaintiffs have failed, as a matter of law, to produce record evidence which, even after all reasonable inferences in plaintiffs' favor are drawn therefrom, could support a jury finding that the Pucketts are liable under § 10(b) and § 20(a) of the Securities Exchange Act. The Pucketts' present motion raises questions of law and fact nearly identical to those addressed by this court in our opinion of December 14, 1987 denying plaintiffs' motion for summary judgment against the Pucketts. In the interests of brevity and in the efficient use of scarce judicial resources (the court's time), we rely implicitly on our previous opinion.

First, the Pucketts' motion for summary judgment on count one, which alleges violations of § 10(b) and Rule 10b–5 promulgated thereunder, will be denied for reasons worthy of only brief articulation.[12] As we have noted, to prevail on a claim that defendants are primary violators of § 10(b), a plaintiff must establish at trial:

1) the existence of a material misrepresentation or non-disclosure "in connection with" the purchase and sale of a security;

2) made with "scienter";

3) upon which the plaintiff reasonably relies;

4) and which proximately causes damage to him.

Opinion 12/14/87 at 6–7. The Pucketts' attack the plaintiffs' showing on the first, second and fourth prongs.

---

**12.** Count one also attempts to state a claim under § 17(a) of the Securities Act of 1933. We have previously held that § 17(a) does not provide a cause of action to civil plaintiffs.

To support their argument that the OS adequately disclosed all material information, the Pucketts cite parts of it which warned potential bondholders of the risks of their investment. However, this does not provide us with a basis for holding that there is no issue of material fact as to the adequacy of that document. Under § 10(b), an omitted fact is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Basic, Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988) (citations and quotes omitted). The plaintiffs have pointed to evidence supporting their allegations that the OS contained serious misrepresentations and omissions of fact.

For example, the OS failed to state that the original proposals made by Edward Puckett and NSR called for NL to sell the Pedricktown plant for $1 million, the July 1, 1982 proposal or $2 million July 16, 1982 and receive a separate payment, upon closing, of SMC's then existing $1.5 million debt to NL. Appendix to Plaintiffs' Motion for Summary Judgment Exhibits I and N (hereinafter "Appendix Exhibit ___"). Nor did the OS indicate that NL had failed to locate other potential buyers for the plant. Most importantly, the OS did not indicate that the real value placed on the Pedricktown plant in the context of the overall transaction was not $3.9 million but actually something substantially less than this because of the excusal of SMC's $1.5 million debt to NL.

The Pucketts assert that the "other transactions" were disclosed; however, the part of the OS mentioning them does not specify that the sale of the Pedricktown plant was contingent upon the excusal of the SMC debt *and vice versa*. In fact, NL informed SMC that it would expect "to receive payment from Standard Metals, Inc. for all installments which were due and payable under the terms of the [Atlanta] "Put Agreement [13] ... on February 14," if the purchase of the Pedricktown plant and the related transactions were not closed during the week of February 7, 1983. Appendix Exhibit X.

In response to plaintiffs' argument that, as a matter of law, the OS's failure to disclose the intended use of the bond proceeds [14] is material for § 10(b) purposes, the Pucketts assert that

> [n]o factual basis exists for the premise that the "other transactions" were based on Bond proceeds. In fact, the 'Atlanta Debt, to which the 'other transactions' are alleged to relate, existed prior to and independent of any purchase of the Plant financed by Bond proceeds.

Pucketts' Brief in Support of Summary Judgment at 8–9. How this follows is hard to grasp. That the debt predated the purchase is, of course, correct. But if it had not been extant, who would have made the purchase price of the plant contingent upon its excusal? We are devoid of any doubt about whether the plaintiffs have produced sufficient evidence to allow a reasonable jury to find that the omissions and/or misrepresentations alleged are material—especially when the omissions relate to the value of the collateral securing the bonds.[15]

The Pucketts' next attack is on the sufficiency of the plaintiffs' showing with respect to scienter. They insist that they believed $3.9 million to be a fair price for the Pedricktown plant, that they believed it would be a profitable investment, and that the "[d]isclosures in the Official Statement were in accordance with [their] expectations that the Plant would have to be prof-

---

13. This is the agreement which was the source of SMC's debt to NL.

14. It allegedly did so by indicating that $3.9 million of the bond proceeds would be used to purchase the plant when, in reality, the $3.9 was used to purchase the plant *and* to retire SMC's $1.5 million debt. *See Beecher v. Able*, 374 F.Supp. 341, 354–356 (S.D.N.Y.1974); *SEC v. Research Automation Corp.*, 585 F.2d 31, 35 (2d Cir.1978) (holding on summary judgment that materiality is established by defendant's failure to disclose the intended use of the investment proceeds).

15. The plaintiff class has also pointed to other evidence suggestive of material omissions, which we need not discuss. *See Appendix passim.*

itable to pay the Bond issue...." Pucketts' Brief in Support of Summary Judgment at 11.

However, the record also indicates that the Pucketts were deeply involved in these transactions. Robert L. Puckett was Chief Executive Officer of NSR and NSNJ, and Edward L. Puckett was Vice President and Director of NSR and NSNJ. They owned 49% of NSR, and therefore 49% of NSNJ. Each voted to approve the SMC/NSR/NSNJ–NL transactions at a December 30, 1982 meeting of the NSNJ Board. Each was on the distribution list to receive copies of the POS and OS. Appendix Exhibit 8. The OS described the Pucketts as having responsibility for "overall management" of the Pedricktown project. Appendix Exhibit B at 16. The portion of the OS which contains some reference to the "other transactions" was drafted by Arthur Young and "is based on assumptions provided by or reviewed with and approved by the management of [NSNJ]," id. at 55; that is, the Pucketts.

The Pucketts were privy to the information the plaintiffs contend should have been disclosed. Their assertions of reliance upon the Aaron appraisal as supportive of the value of the plant do not, as plaintiffs point out, address the issue of whether the Pucketts were reckless, or worse, in failing to disclose the fact that part of the bond proceeds would be used to retire SMC's debt. We cannot, given the Pucketts' intimate knowledge of and participation in the bond offering and the OS, say that there is no material question of fact as to their scienter. Plaintiffs have shown that the Pucketts were aware that over one-third of the plant purchase price was a payment for SMC's debt and aware of the questionable value of the plant as collateral, that the Pucketts received the OS, and Arthur Young indicates that the Pucketts provided information upon which portions of the "financial forecast" are based; and despite their participation and their knowledge of these potentially material facts, the OS did not disclose them.

When we refused to grant plaintiffs' motion for summary judgment, we did so be-cause there was "simply too much evidence that [the Pucketts] prepared the OS with the belief that they were disclosing fully all material information. The plaintiffs may dispute the credibility of this evidence at trial, but dispute is inappropriate for summary judgment." Op. 12/14/87 at 11. To prove scienter, the plaintiffs need not produce confessions of fraudulent intent or other direct evidence of state of mind since such evidence is often unattainable; indeed, "[c]ircumstantial evidence may often be the principle, if not the only, means of proving bad faith." *McLean,* 599 F.2d at 1198. The record before is such that a reasonable jury could certainly find that the Pucketts' failure to disclose the nature of the other transactions, their relationship to the purchase price, and other information affecting the value of the plant was an extreme departure from the standards of ordinary care which created a danger of misleading so obvious the Pucketts must have been aware of it. As such, the issue of the Pucketts' scienter, or lack thereof, is properly for a jury.

The Pucketts' final assault on plaintiffs' § 10(b) claims is directed at the issue of proximate cause. They say that the reasons for the bond default were essentially due to unforeseen problems in the lead market, and thus the plaintiffs cannot show that their losses were due to any fraud by the Pucketts. The plaintiffs' theory, however, is that if the material facts regarding the "other transactions" and plant valuation had been adequately disclosed, the bonds could not have been sold at all or, if marketable, would have sold for a cheaper price. Amended Complaint ¶ 26. As plaintiffs point out, this theory focuses on the value of the bonds at the time they were issued and not subsequent factors affecting their value. Such a theory is a permissible basis for recovery. *Sirota v. Solitron Devices, Inc.,* 673 F.2d 566, 578 (2d Cir.1982). Given our resolution of the Pucketts' arguments as to primary liability under § 10(b), we deny their motion on this ground.

■ The Pucketts have made other arguments which are advanced to support their

motion for summary judgment on plaintiffs' secondary liability aiding and abetting allegations and on count two of the amended complaint, which states a claim of controlling person's liability under § 20(a) of the Exchange Act. These aspects of the Pucketts' motion are grounded solely on supposed failures by the plaintiffs' failure to produce evidence of their scienter; i.e., to show culpable participation in a securities fraud. Though the necessary showing for these theories is somewhat different from that required under § 10(b), we believe the evidence we discussed as relevant to the § 10(b) scienter requirement is equally capable of supporting jury verdicts under these distinct theories. Therefore, we deny the Pucketts' motion for summary judgment in its entirety.

### III. *The Third–Party Defendants' Motions for Summary Judgment*

We turn next to the motions of third-party defendants Arthur Young and Company and Michael Thomas for summary judgment on the complaint of defendant/third-party plaintiff Boris Gresov, and the motion of third-party defendant James P. Conroy and Windels, Marx, Davies & Ives (Conroy's law firm, hereinafter "Windels") for summary judgment on the complaint of defendant/third-party plaintiff Aaron Holman. Our analysis and disposition of these applications proceed in part through channels cut by this court in our previous opinions of April 29, 1987 and December 14, 1987.

On April 29, 1987, we passed on motions to dismiss brought by several third-party defendants, including Conroy and Windels. We held, *inter alia*, that to the extent any of the third-party complaints sought indemnity for liability that might be incurred by them for violations of Rule 10b–5, such a course was barred by the "well settled" rule that indemnification is not available for violations of the federal securities laws. Op. 4/29/87 at 8, *citing Stowell v. Ted S. Finkel Inv. Services*, 641 F.2d 323 (5th Cir.1981). We further found that indemnification was not available under New Jersey law, as none of the third-party complaints had established as a predicate either

an explicit contract of indemnity or sufficient allegations of the existence of an implied right of indemnity. *Id.* at 8–9. We thus determined that the third-party plaintiffs in this case could proceed only upon theories of contribution, and, to state a viable contribution claim, these plaintiffs would have to show that the impleaded parties could be liable as joint tortfeasors to the *primary* plaintiffs. For example, the contribution claims of Gresov against Michael Thomas would have to allege and prove that Thomas was in some way himself liable to the bondholder class for the security violations alleged by that class. We noted that it would not suffice for a third-party plaintiff to simply allege that he had "relied" on the third-party defendant, to the detriment of the primary plaintiffs. *Id.* at 10.

Turning to the motions of Thomas and Arthur Young for summary judgment on defendant/third-party plaintiff Gresov's complaint, we are puzzled that Gresov's position on these motions rests entirely on a theory of reliance, a theory that, as mentioned above, has been specifically rejected by this court in this case. Gresov's briefs in opposition to the motions of Arthur Young and Michael Thomas contain the identical argument that "[a]s a defendant/third-party plaintiff seeking contribution from a potential joint tortfeasor, all that Mr. Gresov must do now is present some evidence indicating that he relied on the expertise of [Young and Thomas] with regard to the claims against him." Gresov Mem. in Opp. to the Motion by Arthur Young at 10; Gresov Mem. in Opp. to the Motion by Michael Thomas at 7. As our April 29, 1987 opinion makes clear, this is an incomplete and incorrect statement of the law of contribution; Gresov must advance some legal theory and some corresponding evidence to demonstrate Arthur Young's and Michael Thomas's liability to the bondholder plaintiffs. Gresov's opposing papers give no hint as to the theory of liability he is pursuing regarding these third-party defendants. However, his respective third-party complaints indicate that he seeks contribution by virtue of Ar-

thur Young's position as accountant to NSNJ and Thomas's position as "acquisition advisor" to NSR, and the respective roles played by them (in these capacities)[16] in the transactions to finance the sale of the Pedricktown plant.

■ In our December 14, 1987 opinion, we set out in some detail the circumstances under which "a non-insider," i.e., someone other than a corporate officer, director or controlling shareholder, might have a "duty to disclose" under § 10(b) and Rule 10(b)(5). Borrowing the "flexible duty" test from the United States Court of Appeals for the Ninth Circuit, we found four factors of that test relevant to finding such a duty. These included: (1) the relationship of plaintiff to the defendant; (2) defendant's benefit, if any, derived from that relationship; (3) defendant's awareness of whether plaintiff was relying upon the relationship in making his investment decisions; and (4) the defendant's role in initiating the transaction in question. See Op. 12/14/87, at 24–25.[17]

The flexible duty test "is not a rigid, mechanical formula." *Stephenson v. Calpine Conifers II, Ltd.*, 652 F.2d 808, 813 (9th Cir.1981). "Not all factors are necessary to a finding of liability in a given case." *Spectrum Financial Companies v. Marconsult, Inc.*, 608 F.2d 377, 385 (9th Cir.1979). By the same token, the mere presence of some of the factors does not necessarily indicate the existence of a duty to disclose. *See, e.g., Kidwell ex rel. Penfold v. Meikle*, 597 F.2d 1273 (9th Cir.1979) (court holding no duty even though three factors favored a duty to disclose). Rather, as the court in *Mirotznick v. Sensey, Davis & McCormick*, 658 F.Supp. 932

(W.D.Wash.1986) put it, "[n]o one factor in the test is determinative, and the analysis to be engaged in by the court is a qualitative one in which the various factors must be judged in relation to each other.... This means that when allegations are lacking or are very weak as to any of the flexible duty factors, allegations as to the remaining factors accordingly should be stronger." 658 F.Supp. at 937.

In December, 1987, we employed the flexible duty test to the defendants, Reuss, MacIntyre & Weyant, the legal counsel to NSNJ, and determined that the firm lacked a duty to disclose to the plaintiff class. Specifically, we found that the relationship between Reuss and the plaintiffs was "quite limited" because, although the firm edited and reviewed the POS and the OS, the majority of its efforts went toward the drafting sections of these documents which were not at issue in the litigation. Op. 12/14/87 at 25. Second, we found that the Reuss firm had received no "special benefit" from their relationship with the plaintiffs; instead, they simply garnered "regular legal fees from their work on the Pedricktown deal and bond offering," fees which "were not contingent upon the success of either the plant sale or the bond offering." *Id.* at 26. Third, we found little evidence that Reuss was aware or should have been aware of any reliance on the firm's representations in view of the limited role played by the firm in the preparation of the POS and OS. *Id.* at 27. Finally, we noted that plaintiffs had presented no evidence to suggest that Reuss had played any role in initiating the bond offering. *Id.*

---

16. The Certificate of Incorporation of NSNJ dated December 12, 1982 identifies Thomas as a member of the board of directors. The OS, dated January 25, 1983, does not list Thomas in this capacity. Thus, it appears that he ceased to function in this capacity sometime before the OS was issued. This fact might be material were it not for the fact that Gresov's third-party complaint is quite clearly aimed at Thomas's activities as a general partner of SVLP and thus states a claim for non-insider liability only.

17. As articulated by the Ninth Circuit, the flexible duty test originally contained five factors.

However, in our letter opinions of February 1, 1985 and December 14, 1987, we noted that the decision of the United States Supreme Court in *Chiarella v. United States*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), reduced the relevance of one of the five flexible duty factors, *i.e.*, the comparison of plaintiffs and defendants' access to information. We therefore decided to concentrate on the remaining four factors in determining whether the defendants possessed a duty to disclose. We follow that course again today.

Applying the flexible duty factors to Arthur Young and Michael Thomas, we again find that the analysis yields no duty on the part of either third-party defendant to disclose anything to the bondholder plaintiffs. Consequently, Gresov is left without sustainable contribution claims.

█ As to Arthur Young, their relationship with the plaintiffs was indirect and limited at best. Their role was confined to auditing the start-up balance sheet of NSNJ and to conducting a review and preparing a draft of the "Financial Forecast" of NSNJ, attached as Exhibit II to the POS and the OS. Admittedly, the Financial Forecast forms the basis for one of plaintiff's claims of omission and misrepresentation. However, Arthur Young merely drafted this section based upon data provided it by the Pucketts; it did not formally audit this data. Rand Aff. ¶ 5; Ex. "A," p. AY 1710. Moreover, Arthur Young's cover letter to the Financial Forecast rather candidly distanced itself from the ultimate veracity of the report, stating, "the forecast reflects *management's* judgment, based on present circumstances, of the most likely set of conditions and management's most likely course of action.... It is usually the case that one or more of the assumptions in a forecast do not materialize because events and circumstances do not occur as expected. Therefore, the actual results during the forecast period will differ from the forecasted results; the differences may be material." *Id.*, (emphasis added). Thus, any "relationship" (indeed any contact) Arthur Young had with the bondholders was through a limited and circumspect statement of review. In a similar situation, the Second Circuit Court of Appeals in *Luce v. Edelstein*, 802 F.2d 49 (2d Cir.1986), refused to find 10(b) liability to the authors of an offering memorandum, which had "warned prospective investors that '[a]ctual results may vary from the predictions and these variations may be material.'" 802 F.2d at 56. The court, speaking through Judge Winter, stated: "We are not inclined to impose liability on the basis of statements that clearly 'bespeak caution.'" *Id.*, (citations omitted).

Regarding the second flexible duty factor, there is absolutely no evidence that Arthur Young received any "particular benefit" or had "any special stake" in the bond offering. Instead, the company received its normal fee for its accountancy work, a fee "not contingent upon the closing of the transaction, the sale of bonds or the eventual success of NSNJ." Rand Aff. ¶ 13. As to the third factor, as related above, any reliance plaintiffs placed upon Arthur Young's representations contained in its draft of the Financial Forecast would necessarily have to be tempered by the language of review itself, which clearly counseled caution. *Luce, supra,* at 56. It is difficult, therefore, to fairly ascribe to Arthur Young any awareness that plaintiffs would rely on their word (as opposed to their professional skill in preparing a financial forecast based on unaudited information and assumptions provided by management) in investing in the industrial revenue bonds.

Finally, defendant Gresov can point to no evidence that Arthur Young in any fashion initiated the bond offering that forms the basis of the primary lawsuit. It appears to be undisputed that Arthur Young's role in this affair was limited to auditing the start-up balance sheet of NSNJ and to drafting the Financial Forecast that became Exhibit II in the POS and OS.

Thus, none of the four flexible duty factors are present here. Arthur Young's motion for summary judgment as to the third-party complaint of Boris Gresov must therefore be granted.

█ Whether the flexible duty test implicates Michael Thomas presents a somewhat closer question; some of the factors which favor finding a duty to disclose are arguably present. However, we find that the possible presence of these factors do not overcome the absence of other factors and cannot create a triable issue of duty.

Thomas owned a 20% interest and was a general partner in the firm of Standard Ventures Limited Partnership ("SVLP"). SVLP was identified in the OS as one of the "parties associated with the financing," specifically, as "acquisition advisor" to

NSNJ. Merely being listed on the OS does not, however, establish a relationship with the bondholder plaintiffs. As the court noted in *Bush v. Rewald*, 619 F.Supp. 585 (D. Hawaii 1985):

> A reasonable investor might consider the identity of those associated with a company to be highly material to a decision whether to invest in that company.... However, that each moving defendant was listed as a "consultant" in the "Directions" brochure, with or without their knowledge or consent, does not, by itself, create any duty on the part of anyone so listed to those who read the brochure and become investors in the firm.

619 F.Supp. at 594 (citation omitted). Thomas had no direct communications with plaintiffs. He was described, instead, as a "middleman," a "go-between between Standard Metals and NL." Reuss Dep. 11/3/88 at 31; Rand Dep. 8/30/88 at 31. SVLP further did not draft any portion of the POS or the OS, nor did it issue any opinion letter on the bond offering. Thomas's relationship to the bondholders was thus minimal to the point of non-existence.

According to Gresov, Thomas "assisted in the sale of the plant on behalf of Standard Ventures Ltd. by introducing NL and the Pucketts to Hereth, Orr and Jones, Inc., for which services he was paid a commission." Gresov's Answers to Plaintiff's First Set of Interrogatories at 8. This is the only allegation of "benefit" received by SVLP and Thomas; it is unclear whether this commission was anything more than ordinary payment for services, or whether it was in some way contingent upon the successful consummation of the sale. Assuming it was, an inference could be made that Thomas had a stake in the plant sale. However, it is somewhat of a logical leap to derive from this inference an assumption that defendant derived a benefit *from his relationship to the plaintiffs*, as the second factor of the flexible duty test requires.

In view of the virtual lack of any relationship between Thomas and the plaintiffs, and Thomas's complete non-involvement in the preparation of the POS or the OS, there is no conceivable way Thomas could have any awareness of reliance on his representations by plaintiffs for the simple reason that this defendant made *no* representations upon which reliance could be placed. Thus, the third factor of the flexible duty analysis, like the first, is wholly absent here.

Finally, this defendant argues that "[t]he plaintiffs have not come forward with any proof that Thomas initiated the bond offering or did more than act as a go-between in the sale of the plant." Thomas's Brief at 13. Technically, this is correct; the submissions of the bondholder plaintiffs and, more importantly, third-party plaintiff Gresov, are completely barren on this issue. However, evidence of Thomas's possible role in the bond issue has surfaced in the moving papers submitted on the motion by Conroy and Windels for summary judgment (discussed below). This evidence includes a letter by Thomas to NJEDA bond counsel, drafted in the winter of 1982, in which Thomas discussed particulars of the bond offering. This evidence shows *awareness*, but not necessarily initiation. See Op. 12/14/87 at 26 (evidence adduced to show Reuss was aware of interlocking transactions not sufficient to establish duty). In a similar vein, Edward Puckett testified in deposition of an early plan devised by Thomas and James Conroy to purchase the Pedricktown facility for $1 million, describing it as "one of a series of acquisition scenarios that were developed by Mike Thomas and Jim Conroy." E. Puckett Dep. 9/14–15/88, at 62; Hooke Cert., Ex. "D." While this partakes of initiation, it is not necessarily initiation of the *bond offering*. In sum, while there is some evidence of Thomas's involvement in the transaction, it is not compelling enough to overcome the fact that Thomas was a virtual stranger to the plaintiff bondholders. Consequently, we find no duty to disclose on the part of Thomas. His motion for summary judgment as to Gresov's third-party complaint is granted.

■ Remaining before us is third-party defendants Conroy and Windels's motion

for summary judgment on the third-party complaint of Aaron Holman. As these entities were also not corporate insiders,[18] it is appropriate to apply the flexible duty test to them as well.

At the time of the transactions at issue, Conroy and Windels had been legal counsel to SMC for at least five years.[19] It is also alleged that Conroy and Windels acted as counsel to NSR and NSNJ at the time of the project. R. Puckett Dep. 9/15/88 at 38; Hooke Ans. Cert. ¶ 3. However, Conroy and Windels's relationship to *the plaintiffs* (which is the relevant relationship to assess under the flexible duty test) appears extremely attenuated. Neither Conroy nor Windels are listed in or are in any way referred to in the OS. Holman alleges that a relationship between these defendants and the plaintiffs arises by virtue of the fact that Windels drafted one paragraph of the Risk Factors section of the OS and, more importantly, because Windels issued an opinion letter which was addressed to, among other people, the trustee for the bondholders.

The fact that Windels authored a portion of the Risk Factors section is of no moment because the plaintiff class has not contended that this section misrepresented or omitted material information, or that they in any fashion relied on this section. Conroy Aff. at ¶ 13. Similarly, in our December 14, 1987 opinion, we held that the work performed by the Reuss law firm on the POS and OS was not relevant in divining their relationship with plaintiffs because the sections they worked on were not in issue in this litigation. Op. 12/14/87 at 25.

The opinion letter signed by the Windels' firm does bear on the relationship, because it did at least get forwarded to the trustee for the plaintiff bondholders. However,

the record indicates that the letter was requested by Alston & Bird, not for inclusion in the OS (which had already been drafted), and indeed not primarily for dissemination to the bondholders at all, but merely to assuage NL's concerns regarding the financial stability of SMC, which had caused NL to pull back from the first scheduled closing of the plant sale. Conroy Reply Aff. ¶¶ 3–6. Indeed, examination of Windels's opinion letter demonstrates that it is confined, in the main, to an opinion of the stability of the SMC stock due to be issued to NSNJ as part of the transaction, and a recitation of the solvency of SMC generally. "While it is certainly true that an indirect relationship with the plaintiff may be sufficient to impose a duty of disclosure on the defendant, the very tenuous nature of the link between plaintiffs and defendants here must be taken into account in applying the flexible duty test." *Mirotznick, supra*, 658 F.Supp. at 938.

Turning to the second factor—the benefit derived by the defendant from the relationship with the plaintiff—it appears that Windels received fees customary for their services rendered in the transaction. Conroy, however, soon after the bond closing, was elected interim director on the Boards of NSR and NSNJ. Holman makes much of this development, despite his inability to advance any evidence to indicate that Conroy's ascendancy was contingent upon the success of the bond offering. Still, the fact of Conroy's election raises, as in the case of Thomas's "commission," at least an inference of a benefit conferred by the transaction beyond normal compensation for services.

The third factor, awareness of reliance, can be disposed of with reference to the first factor discussed above. Again, the

---

**18.** Holman's third-party amended complaint alleged that Conroy was a member of the Board of Directors of both NSR and NSNJ at the time the bonds were issued. Conroy has pointed out, however, that he was not elected to these Boards until March 7, 1983, some two weeks after the closing of the bond transaction, and that, indeed, the OS does not list Conroy as an officer or director of NSNJ. Conroy Aff., ¶ 6. Holman has apparently, albeit grudgingly, accepted this representation. *See* Holman Cert.

¶ 8. Accordingly, we do not consider Conroy an "insider" for the purposes of the motion before us.

**19.** The Windels's firm represented SMC since 1968. Gresov Aff., 12/88. Most of Windels's work for Standard had been done by Conroy for at least five years prior to the relevant time period. Holman Opp. Cert., ¶ 2.

sole evidence relevant to this inquiry is the Windels's opinion letter. As stated above, the evidence indicates that this letter was issued to pacify the seller, N.L. Industries, rather than to induce investment by the bondholder. We find this factor, like the first one, to be largely missing from the calculus.

The final factor, defendant's initiation of the transaction, does appear to attract a substantial amount of evidence. Holman has, to use defendant's characterization, "bombarded" the court with citations to record evidence in an effort to convince us that Conroy and Windels's role in the plant sale and bond offering was seminal and decisive. We accept defendant's further description of much of this evidence as "immaterial" or "fanciful." Conroy & Windels's Reply Brief at 2. However, there are bits of evidence *specifically* related to the bond offering that are not as easily dismissed.

For example, in addition to Edward Puckett's assertion that Thomas and Conroy were responsible for developing "a series of acquisition scenarios" for the purchase of the Pedricktown plant, E. Puckett Dep. 9/14–15/88 at 62, there is Holman's statement in his certification that "[a]s far as the Pedricktown transaction and the bond financing were concerned, Mr. Conroy was in charge of coordinating everything." Holman Op. Cert. ¶ 2. Holman further testified at deposition "that Windels recommended that a bond issue be floated." Holman Dep. 8/9/88 at 29, 54. Holman also alleges that Conroy gave a review of the transactions associated with the purchase and finance of the Pedricktown plant to the Board of Directors of SMC and recommended their approval of the deal. Holman Dep. 8/9/88 at 76. Edward Puckett similarly states that "to the best of [his] recollection," Conroy recommended ratification of these transactions at the meeting. Puckett Dep. 9/14–15/88 at 253. And, the minutes of the Board meeting, dated January 5, 1983, indicate that "[t]he Chairman ... requested Mr. Conroy to summarize and review in general the terms and provisions of the various agreements and documents relating to the Pedricktown

matter, and Mr. Conroy did so." *See* Hooke Ans. Cert. Ex. "Z," p. 2.

Conroy, in affidavits submitted in support of this motion, denies such detailed involvement by him or his firm in bringing the "Pedricktown matter" to fruition. Conroy Aff. ¶¶ 5, 10. Holman, however, in his certification, declares: "I have read Mr. Conroy's affidavit submitted in support of his motion. Mr. Conroy's description of his involvement in the Pedricktown transaction as being limited is simply not true." Holman Op. Cert. ¶ 2. Holman relates that Paul Windels complained to him at the time the bond transaction was being put together that the Windels's firm was "really running Standard." *Id.* at ¶ 6. Holman also "distinctly remember[s]" a Conroy pitch to the NSR and NSNJ Boards to approve the transactions. *Id.* at 7.

In short, there is enough evidence of Conroy and Windels's influence and involvement in the Pedricktown purchase and financing to indicate the presence of the fourth factor in the flexible duty analysis. However, we believe that the virtually complete absence of any definable relationship between these defendants and the bondholder plaintiffs, as indicated by the weakness of factors one and three, indicates the lack of a triable issue as to whether Conroy and Windels had a duty to disclose. Therefore, we will grant summary judgment as to Holman's claim that Conroy and Windels are liable to him in contribution because they are liable to the plaintiff class for a primary violation of the federal securities laws.

■ Our inquiry does not end here, however, because Holman, unlike Gresov, has also alleged that the impleaded defendants Conroy and Windels are *secondarily* liable to the plaintiff class under an aiding and abetting theory and a "controlling persons" theory.

In order to make out a case of aiding and abetting a security violation under Rule 10b–5, Holman must show:

(1) an independent wrongful act—an underlying securities violation;

(2) knowledge by aider and abettor of that wrongful act; and

(3) knowing and substantial assistance in effecting that wrongful act.

*Monsen v. Consolidated Dressed Beef Co.,* 579 F.2d 793, 799 (3d Cir.), *cert. denied,* 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978). In our previous letter opinion of December 14, 1987, we held that "the same evidence plaintiff proffers on the issue of [defendant's] duty in primary liability is relevant to finding aider and abettor liability as well. This is so because aider and abettor liability requires a showing of 'substantial participation in a primary securities violation,' a showing very similar to that which creates a flexible duty to disclose." Op. 12/14/88 at 20. Conroy and Windels have seized on this language to argue that if we find that they lacked a duty to disclose under the flexible duty test, we must consequently hold that they cannot be liable under an aiding and abetting theory.

This is not necessarily so. In *Harmsen v. Smith,* 693 F.2d 932 (9th Cir.1982), the Ninth Circuit warned against such blurring of distinctions between primary violations of section 10(b) under a flexible duty to disclose, and secondary violations for aiding and abetting. As to the former, a duty to disclose arises from the defendant's involvement with a company whose securities are at issue and defendant's relationship with the plaintiffs. As to the latter, liability may attach to the defendant by virtue of his "knowing assistance of or participation" in the underlying securities violation, irrespective of his relationship with the plaintiffs. 693 F.2d at 944; *see also Wright v. Schock,* 571 F.Supp. 642, 663 (N.D.Cal.1983) (discussing *Harmsen's* "clarification" of the distinction between secondary/primary violations of section 10(b)).

Keeping this distinction in mind is particularly important in a case such as this, in which there appears to be ample evidence of a party's knowledge of and involvement in the alleged securities violation, coupled with a commensurate absence of relation to the plaintiffs. It is also not inconsistent with our previous pronouncement that a showing of "substantial participation" is a showing "very similar" to that which creates a flexible duty to disclose. Two of the four factors of the flexible duty test go to involvement in and initiation of the disputed transaction; the only difference (and the crucial difference here) is that a finding of flexible duty requires some semblance of a relationship between the parties.

Holding Conroy and Windels strictly to the test of aider and abettor liability, we cannot say, as a matter of law, that these defendants could not be found liable to the plaintiff class for secondary violations of Rule 10(b). As we noted in *Laven, supra,* aiding and abetting liability is premised on knowledge; "culpable participation," i.e., knowing and substantial assistance in the violation; and a "conscious intent" to aid in effecting the wrongful act. Given just the partial recitation of evidence set out above linking Conroy and Windels to active leadership roles in the structuring of the Pedricktown transaction, there is at least a triable question as to whether they were aware that the information released to the bondholders regarding the transaction was violative of section 10(b), and whether their actions were consciously calculated to assist in the perpetration of this violation.

We therefore deny defendants Conroy and Windels's motion for summary judgment as to Holman's aiding and abetting claim.[20]

---

**20.** However, we grant defendants' motion as to Holman's "controlling person" claim. Section 20(a) of the Securities Exchange Act, as we have quoted above, applies only to persons "who, directly or indirectly, control[ ]" issuers, sellers, and other people directly liable. Conroy and Windels's role in the transaction, no matter how decisive, was still undertaken in the context of legal counsel to SMC, and "[t]heir ability to persuade and give counsel is not the same thing as 'control,' which almost always means the practical ability to *direct* the actions of the people who issue or sell the securities." *Barker v. Henderson, Franklin, Stames & Holt,* 797 F.2d 490, 494 (7th Cir.1986) (emphasis in original) (holding a law firm to corporation that issued bonds in violation of federal securities law cannot be held liable as controlling person under sections 15 or 20(a) of the Securities Exchange Act).

IV. *Motion to Dismiss the Claims Assigned to Plaintiffs by Alston & Bird*

Finally, defendant Gresov and third-party defendants Windels, Marx, Davies & Ives and James Conroy have moved to dismiss claims which were assigned to the plaintiff class by defendant Alston & Bird as part of a partial settlement accepted by this court on April 25, 1989. The settlement provided for an assignment from Alston & Bird *"to the extent permitted by law,* to the Settlement Class [of] all rights, claims and causes of action which [Alston & Bird] has, formerly had, or could, shall or may have which relate to the Project or the Bonds against ... Windels, Marx, Davies & Ives, James Conroy, [and] Boris Gresov." Settlement Agreement ¶ X(A). (Emphasis added.)

The claim Alston & Bird has asserted against the moving parties is a claim for contribution with respect to the federal securities and state common law claims asserted against it by the plaintiff class; it is these claims the moving parties seek to dismiss.

With respect to these contribution claims, the moving parties do not dispute that contribution is available under the Federal Securities laws, even under provisions of the Securities and Exchange Acts for which no express statutory contribution right exists, such as § 10(b) of the Exchange Act. *Seiler v. E.F. Hutton & Co.,* 102 F.R.D. 880, 885 (D.N.J.1984) (citing cases). However, they strenuously argue: (1) that § 10(b) actions are not assignable; (2) that the plaintiff class has no standing to pursue the assigned claim; (3) that Alston & Bird, because its settlement with the plaintiff class contains a denial of wrongdoing, can never be considered a joint tortfeasor who has discharged more than its fair share of a joint liability and therefore possesses no contribution claim. While we do not necessarily agree with these contentions, we believe that the assigned claims should be dismissed for a different, but still fundamental, reason. Before discussing that reason, we pause to consider the moving parties' arguments.

First, with regard to the question of assignability, it is by no means certain that a federal § 10(b) cause of action, as opposed to a New Jersey State law cause of action, cannot be conveyed by an express assignment. While the Court of Appeals for the Third Circuit's *en banc* hearing of *Lowry v. Baltimore & Ohio Railroad Company,* 707 F.2d 721 (3d Cir.), *cert. denied,* 464 U.S. 893, 104 S.Ct. 238, 78 L.Ed.2d 229 (1983), produced little, if any, harmony on the law to guide the district courts of this circuit, six of the eight circuit judges clearly indicated that, at least when there is an express assignment, a § 10(b) action could be assigned to a subsequent purchaser of a security. *See Gardner v. Surnamer,* 608 F.Supp. 1385, 1390 (E.D. Pa.1985). Of course, other courts have held that § 10(b) claims are not *automatically* assignable. Most have done so, however, in the context where a subsequent purchaser who paid a reduced price for the security because of public revelation of fraud, attempts to argue that the right to sue under § 10(b) runs with the security. Courts have been chary about according standing to such a purchaser since this would deprive the true victim, i.e., the purchaser who suffered the loss because of the fraud, of her cause of action and unduly benefit someone who had not been harmed. *See, e.g., In re Nucorp Energy Securities Litigation,* 772 F.2d 1486, 1490 (9th Cir.1985) (holding that there is no automatic assignment of securities actions, "otherwise, we would remove the remedy from those to whom the statute provides it, i.e., those who were defrauded, by gratuitously giving it to those who were not defrauded and have suffered no injury under the securities law"); *accord, In re Saxon Securities Litigation,* 644 F.Supp. 465 (S.D.N.Y.1985); *Independent Investor Protective League v. Saunders,* 64 F.R.D. 564 (E.D.Pa.1974). Here, where there has been an express assignment, there is absolutely no danger that a victim of fraud will be unwittingly deprived of a cause of action. Hence it is at the very least an open question whether a § 10(b) action may be expressly assigned. As for the New Jersey state law tort claims, there is more

reason to doubt the validity of their assignment, at least prior to judgment. *See Amato v. Amato,* 180 N.J.Super. 210, 434 A.2d 639 (App.Div.1981).

Second, defendant Gresov argues that an assignment of a § 10(b) claim to the plaintiff class here is impossible because § 10(b), and Rule 10b–5 promulgated thereunder, expressly limits its protective coverage to purchasers or sellers of securities, and that only persons in either of these classes have standing to litigate such claims. Initially, because of the unusual nature of the assignment in the case before us, this is not a bar since the plaintiff class certainly are purchasers of securities, who contend that their purchase was induced by misrepresentations and fraud violative of § 10(b) and Rule 10b–5.

■■■ Third, the argument that Alston & Bird's denial of liability precludes a contribution claim by it ignores that a jury will, after a trial in this court, determine whether Alston & Bird is a joint tortfeasor and what amount of money constitutes its fair share of the loss suffered by the plaintiff class. We believe that such a adjudication of Alston & Bird's liability could serve as the basis for a contribution claim under the federal securities laws, and, because the Alston & Bird settlement has been entered as a judgment, under New Jersey law. *Young v. Steinberg,* 53 N.J. 252, 255, 250 A.2d 13 (1969) ("A suit for contribution based on a settlement which has been elevated to the status of a judgment by formal court proceeding, and which discharged the injured party's claim against a non-settling joint tortfeasor, comports with the intent of our statutory scheme"); *Poli-*

*dori v. Kordys, Puzio & DiTomasso,* 217 N.J.Super. 424 (App.Div.1987).

■■■ While we would dwell on these arguments at some length if the movant's motion depended upon them, we need not resolve these large issues, such as whether § 10(b) claims are expressly assignable or whether a claim for contribution may ever be assigned. Rather, we rest our dismissal of these assigned claims on a fundamental principle of contribution. That is, under either federal common law, which governs the contribution rights of the parties with respect to § 10(b), *see Gardner,* 608 F.Supp. at 1390, or New Jersey law, which the parties agree applies to the state law claims, a prerequisite to recovery by a settling tortfeasor seeking contribution is that the settlor, at a minimum, must have discharged more than his fair share of a joint liability. *See e.g., MacLean v. Alexander,* 449 F.Supp. 1251, 1265 (D.Del.1978), *rev'd on other grounds,* 599 F.2d 1190 (3d Cir. 1979) ("it is fundamental that for principles of contribution to apply, one seeking contribution must be assessed or have paid more than his proportionate share"); N.J.S.A. 2A:53A–1 (1987); *Pennsylvania Greyhound Lines, Inc. v. Rosenthal,* 14 N.J. 372, 386, 102 A.2d 587 (1954) (right to contribution "arises out of a payment in excess of the payor's just share of the common obligation ensuing from a common wrongful act, neglect or default ..."). In this action, Alston & Bird can never be found to have discharged more than its fair share of the joint liability since we have held that the judgment the plaintiff receives at trial will be reduced *only by that proportion which the jury assigns as Alston & Bird's appropriate share of the total damages.*[21]

21. This decision was announced by the court on April 25, 1989. The reason for adopting this approach, rather than adopting the non-settlor's arguments that they were entitled to a credit of the greater of the (1) proportion of the liability attributed by the jury to Alston & Bird; or (2) the amount of the settlement were set forth in full at that time. Principally, they consist in the notion that, given our application of the proportional bar, the plaintiff class was entitled to the benefits of the settlement process since they were bearing its risks.

This view is shared by Professor Adamski, whose views on these subjects influence our entire analysis:

Although allowing the plaintiff to recover more than the total damages may be considered unjust enrichment of the plaintiff, it is also unjust to allow the nonsettlor, who has been found liable, to reduce his payment or to escape payment altogether merely because the plaintiff negotiated a favorable settlement. The problem of unjust enrichment could be avoided by requiring the nonsettlor to pay the entire judgment less the settling defendant's relative share of total damages, without re-

Hence, if Alston & Bird's fair share of a $6,000,000 verdict is found to be $200,000, and it settled for $400,000, the verdict against the non-settling defendants would be reduced to $5.8 million. No more than its fair share will have been applied to reduce the judgment against the joint tort-feasors; rather, it will go to the plaintiff class which accepted the risks of settlement. This outcome, in our view, appropriately flows from the use of the proportional settlement bar or, more accurately, the proportional judgment reduction mechanism. Our present scenario is usefully compared to two different ones.

The first involves the use of a *pro tanto* judgment reduction mechanism. Under such a *pro tanto* bar, the court would, presumably, determine that the settlement amount represented a reasonable approximation of the settling defendant's culpability. As such, the settlement amount would be deducted from the jury's verdict, and non-settlor's contribution claims would be barred because the court had determined that the settling party had discharged its "fair" share of the joint liability. That is, if we used such a *pro tanto* approach, we would reduce any verdict obtained by the plaintiff class at trial by $400,000. As the non-settling parties all vociferously argued, such an approach places the risk of a bad settlement on non-settlors, rather than the plaintiff class; an unfair result. Moreover, the requirement of a judicial determination that the settlement fairly represents the settlor's share of the joint liability requires a burdensome exercise in judicial guesswork. Thus, the application of such a *pro tanto* bar will bar any contribution claims, since imposition of the bar presupposes that the settlement equals the settling par-

ty's fair share, and nothing more, of the total joint liability.

A different analysis might obtain under a second scenario. In this situation, the court would accept a settlement but not make a determination that the settlement amount constituted a fair share of the joint liability. In this case, a court could reduce the judgment by the settlement amount and presumably allow the settlor to pursue a contribution claim against the non-settling defendants. That is, if a party settled with the plaintiff class for $400,000 and this was applied to reduce a $6,000,000 verdict to $5,600,000, the settlor would be free to obtain contribution if he could show that his proportionate share of the total liability amounted to only $200,000, since he had discharged more than his share of the joint liability. Of course, one would expect that the non-settling parties, in fairness, would also be permitted to pursue a contribution claim against the settling party. If such an approach is adopted, however, there remains absolutely no incentive to settle with the plaintiff, since such a settlement would be accompanied by no repose.

This, therefore, is an unlikely scenario. But assuming it could exist, one way in which a defendant might settle is if it could obtain repose by reaching an accord with the plaintiff class whereby the plaintiff class would indemnify the settlor against contribution claims, and the settlor would assign the plaintiff class its contribution claims so that the plaintiff class could keep the fruits of a favorable bargain. This would approximate the results under a proportional settlement bar. Assume, e.g., that a plaintiff settles for $400,000 and

gard to the amount paid in settlement. Although plaintiff's recovery through satisfaction of judgment in one or more actions is limited to actual damages under the Securities Exchange Act, it can be argued that the actual damage limitation is not offended so long as each wrongdoer is not required to pay more than his share of actual damages. The actual damage limitation should not be applied to the reduction of judgment approach in such a way as to unjustly enrich the remaining defendant at plaintiff's expense, particularly since the plaintiff bears a substantial risk that

the judgment will be reduced in the event of an underpayment. Limiting the reduction of damages to the proportionate fault of the settlor without the overriding effect of the single satisfaction rule will help to encourage settlements without prejudice to the nonsettlor, who is merely required to pay the share of plaintiff's actual damages that the nonsettlor would have had to pay in the absence of the settlement.

M.P., Adamski, Contribution and Settlement in Multiparty Actions under Rule 10b–5, 66 Iowa L.Rev. 533, 566–567 (1981).

achieves a $6,000,000 verdict. If $400,000 is subtracted from the verdict, then the plaintiff would receive $6,000,000—$5,600,000, plus $400,000. If plaintiff could prove that the settlor's fair share was only $200,000, it could obtain $200,000 additionally on the contribution claim assigned to it by the settlor.[22] In essence, the non-settlors litigate contribution with the plaintiff instead of the settling defendant. Under a proportional judgment reduction mechanism, the same results obtain. If the jury determines that Alston & Bird's fair share is actually $200,000, and the plaintiffs receive a $6,000,000 verdict, they will recover $6,200,000—$5,800,000 from the verdict, plus $400,000 from the Alston & Bird settlement.[23]

For all practical purposes then, a contribution claim will exist after a partial settlement only if a court applies a one-way settlement bar. That is, one in which a court reduces a judgment by the amount of a settlement, bars contribution claims against the settlor, *but allows the settlor to pursue the non-settlors in contribution*—a patently unfair result. Assuming that courts would not sanction such a one-way bar, it becomes apparent that the proportional settlement bar is simply a much more efficient way to achieve the same result as an assignment of a settlor's contribution claims. The settlor obtains repose by leaving the plaintiff with the risk that the settlor got off cheaply and is liable for contribution (and the benefit if the settlor paid too much), the non-settlors are protected by the proportional judgment reduction mechanism, and the contribution claims of the settlor vis-a-vis the non-settlors is litigated solely in the context of judgment reduction.

These examples suggest that where a *pro tanto* bar or proportional bar is imposed, no contribution claims exist to be assigned. While there may be situations where this is not necessarily the case, we are convinced, as a matter of law, that contribution claims possessed by Alston & Bird may not result in additional relief. Since the plaintiff class received, insofar as the assignment was effective, only so much as Alston & Bird possessed, the claims assigned to them by Alston & Bird against Boris Gresov, Windels, Marx, Davies & Ives and James Conroy are dismissed.[24]

To conclude and summarize this rather lengthy opinion: defendant Aaron Holman's motion for summary judgment is denied. Defendants Robert Puckett and Edward Puckett's motion for summary judgment is denied. Third-party defendants James Conroy and Windels, Marx, Davies and Ives's motion for summary judgment on the third-party complaint of Aaron Holman is granted in part and denied in part. Third-party defendant Arthur Young's motion for summary judgment on the third-party complaint of Boris Gresov is granted. Third-party defendant Michael Thomas's motion for summary judgment on the third-party complaint of Boris Gre-

22. On the other hand, if the non-settlors could show that the settlor's fair share was $600,000, rather than $400,000, they could essentially reduce the plaintiff's total judgment, by way of contribution to $5,800,000, even though the total harm suffered was $6,000,000.

23. Similarly if the jury determines that Alston & Bird's fair share of the joint liability is $600,000, the plaintiff will recover $5,800,000—$5,400,000 from the verdict, plus $400,000 from the Alston & Bird settlement.

24. While we have earlier decided that crediting the non-settlors with only the proportional share attributed to Alston & Bird at trial will not violate the so-called "single recovery rule," to go further and hold that the plaintiffs are not only entitled to the benefit of a favorable settlement but also to some recovery based on "contribu-

tion" is not only impossible as a matter of contribution, it would truly violate the single recovery rule since the plaintiff would recover from Gresov, Windels and Conroy more than the damages attributed by the jury to them at trial. That is, if Alston & Bird's liability is fixed at $200,000 at trial, and a verdict of $6,000,000 is returned, and Gresov was the only other defendant held liable, the plaintiffs argue that they should be able to recover $6,400,000—$400,000 from Alston & Bird, plus $5,800,000 from the verdict, plus $200,000 from Alston & Bird's assigned contribution claim. Thus, Gresov will, under plaintiff's theory, be forced to pay its fair share of the joint liability, plus the amount of any overpayment by Alston & Bird, despite the fact that no part of that overpayment went to reduce Gresov's liability to plaintiff. This is a result the federal securities laws and the law of the State of New Jersey will not tolerate.

sov is granted. Defendant Boris Gresov and third-party defendants Conroy and Windels, Marx, Davies and Ives's motions to dismiss the contribution claims assigned to the plaintiffs by Alston & Bird are granted.

The court will issue an appropriate order.