Ronald A. **PANNA**, et al., **Plaintiffs**,

v.

**FIRSTRUST SAVINGS BANK, Neil I. Rodin, North Atlantic Investment Corporation, Rodin Realty Investment Corporation, Joseph Dennis Pasquarella & Co., Joseph Dennis Pasquarella, Rodin Management Inc., Rodin Enterprises Inc., Fifty–Three Hundred Boardwalk, Inc., Ivan J. Krouk, Regional Realty Investments I, Inc., Sanders D. Newman, Blank, Rome, Comisky & McCauley, and Laventhol & Horwath, Defendants.**

**Civ. No. 89–3732(SSB).**

United States District Court, D. New Jersey.

Oct. 30, 1990.

---

Steven M. Coren, Kaufman, Coren & Ress, Philadelphia, Pa., for plaintiffs.

John F. Stoviak, Saul, Ewing, Remick & Saul, Philadelphia, Pa., for defendant Firstrust.

Jeffrey S. Batoff, Obermayer, Rebmann, Maxwell & Hippel, Philadelphia, Pa., for defendant Rodin Realty.

Mark Schwartz, Kenney & Kearney, Cherry Hill, N.J., for defendant Laventhol & Horwath.

William B. Hildebrand, Slimm, Dash & Goldberg, Philadelphia, Pa., for defendant Pasquarella & Co.

Edward Toole, Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., for defendant Joseph Dennis Pasquarella.

Justin P. Walder, Walder, Sondak, Berkeley & Brogan, P.A., Roseland, N.J., for defendant Blank, Rome.

## OPINION

BROTMAN, District Judge.

Presently before the court is the motion of defendants Firstrust Savings Bank (Firstrust); Neil I. Rodin, North Atlantic Investment Corporation (NAIC), Rodin Realty Investment Corporation (RRIC), Rodin Management, Inc., Rodin Enterprises, Inc., and Ivan J. Krouk (collectively, the Rodin Defendants); Blank, Rome, Comiskey and McCauley (Blank, Rome); Joseph Dennis Pasquarella & Company and Joseph Dennis Pasquarella (Pasquarella); and Laventhol & Horwath (L & H) to dismiss all counts of the complaint against them. Because of the complex nature of the case,[1] this court will address the defenses common to all defendants first before addressing the defenses particular to individual defendants, if necessary.

## I. FACTS AND PROCEDURE

Plaintiffs are twenty-five limited partners of Oceanaire Associates, a Pennsylvania limited partnership formed in 1984 to

---

1. The complaint, which alleges securities fraud, RICO violations, New Jersey RICO violations, New Jersey Consumer Fraud Act violations, common-law fraud, negligent misrepresentation, professional malpractice, civil conspiracy, and breach of fiduciary duty and mismanagement, was filed by twenty-five plaintiffs, limited partners in "Oceanaire Associates," a real estate venture holding a single property in Ventnor, New Jersey, against fourteen defendants. The five separate motions to dismiss represent all defendants except Fifty–Three Hundred Boardwalk, Inc., Regional Realty Investments I, Inc., and Sanders D. Newman.

purchase and control property in Ventnor, New Jersey known as the "Oceanaire Apartments" (the property). Plaintiffs' allegations, which the court must take as true at this stage of the pleadings, *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), are the following: On March 16, 1981, Defendant Fifty–Three Hundred Boardwalk, Inc. (Fifty–Three Hundred) purchased the property utilizing purchase money financing of $3,800,000 obtained from Defendant Firstrust.[2] As Firstrust knew, Fifty–Three Hundred planned to market and sell the property as individual condominium units, with the income to be used to pay back the principal and interest on the Firstrust mortgage. Fifty–Three Hundred was to pay interest only on the mortgage for the first twelve months; at the end of this period, the entire loan balance was to be due and payable in full. Fifty–Three Hundred's efforts to market the property as condominium units, however, were unsuccessful and on March 16, 1982, it defaulted on it obligations to Firstrust. Firstrust, however, did not exercise its right to foreclose upon and take back the property at this time.

While Firstrust and Fifty–Three Hundred discussed what to do with the property, Fifty–Three Hundred operated the unsold units (approximately six out of sixty-two units were sold as condominiums) as a motel. The revenues generated from operating the property as a motel, however, were insufficient to pay the interest owed on the debt to Firstrust.

At this same time, Firstrust was in the process of converting from a federal mutual savings and loan association to a Pennsylvania stock savings bank. In order to complete that process, Firstrust was required to prepare a proxy statement and other documents disclosing in-depth financial information, including problem loans and bad debts; these documents were required to be filed with various federal and state regulatory bodies. Rather than initiate mortgage foreclosure proceedings in connection with the property owned by Fif-

ty–Three Hundred, and thereby disclose the loan at the same time it sought to convert to a stock company, Firstrust allegedly initiated a fraudulent scheme to avoid any such disclosure.

Plaintiffs contend that Firstrust approached the Rodin Defendants and arranged for them to syndicate the property as a way to avoid disclosure and to "unload[ ] this problem property to unsuspecting investors in the form of securities." Complaint at ¶ 51. Firstrust worked with the Rodin Defendants in preparing the offering materials that were presented to the plaintiffs and approved them knowing they contained numerous material omissions and misrepresentations. Central to plaintiffs' claim is the alleged failure to disclose the earlier unsuccessful marketing of the property as condominium units by Fifty–Three Hundred.

On May 12, 1983, Defendants Fifty–Three Hundred, NAIC and Firstrust entered into an agreement pursuant to which Fifty–Three Hundred agreed to sell, and NAIC agreed to buy, the remaining condominium units of the property. This agreement was expressly conditioned on the successful syndication of the property by forming a limited partnership, selling the property to the limited partnership, and selling limited partnership interests to outside investors.

Beginning in June, 1984, a number of the defendants, including Firstrust, the Rodin Defendants, Fifty–Three Hundred, Regional Realty, and Newman, began offering and selling to the public approximately $2,000,000 of unregistered securities in the form of limited partnership interests in Oceanaire Associates, of which Regional Realty was the general partner. These unregistered securities were marketed through a 110–page "Confidential Memorandum Dated June 18, 1984" (Offering Memorandum), which was provided to each plaintiff. The Offering Memorandum was

---

**2.** At the time, Firstrust was known as First Federal Savings and Loan Association of Philadel- phia.

attached as an exhibit to the Complaint for the court's attention.

Other defendants were hired by the Rodin Defendants and Regional Realty to advise them on the transaction. Defendant Blank, Rome represented them in connection with the syndication, helped prepare the Offering Memorandum, and issued a tax opinion on the consequences of investing in Oceanaire Associates. Defendant Pasquarella & Company was engaged to appraise the property. Defendant L & H was engaged to review and issue an opinion concerning various financial projections concerning the limited partnership. The syndication and purchase of the property by Oceanaire Associates were conditioned upon an appraised market value exceeding the $5,800,000 purchase price to be paid by Oceanaire Associates. The appraisal, which was issued by Pasquarella & Company on June 18, 1984, and appraised the property at $5,925,000, was not attached to the Offering Memorandum and allegedly was not available.

On August 31, 1984, pursuant to the earlier agreements, NAIC and RRIC purchased the property from Fifty–Three Hundred for approximately $4,000,000 and then immediately "flipped" and sold the property to Oceanaire Associates for approximately $5,800,000. The property was sold subject to a $3,500,000 underlying first mortgage owed to Firstrust. On that same date, plaintiffs collectively purchased 20 units of limited partnership interests in Oceanaire Associates at $50,000 per unit ($70,000 per unit on an installment basis).

Plaintiffs claim that, as defendants knew would be the case at the time of the syndication, the revenues subsequently generated from the operation of the property as a motel, and the failure to sell the property as condominium units, would make it impossible to service the debt owed to Firstrust. Such a situation, they contend, made foreclosure inevitable, as the defendants knew all along.

On April 20, 1989, Firstrust commenced mortgage foreclosure proceedings in connection with the property. On August 2, 1989, Oceanaire Associates filed a Voluntary Petition in the United States Bankruptcy Court for the Eastern District of Pennsylvania, for reorganization pursuant to Chapter 11 of Title 11 of the U.S.Code, which petition is pending. Plaintiffs filed this suit on September 7, 1989. Pursuant to stipulation entered into by Firstrust, Oceanaire Associates and some of the plaintiffs, and approved by the Bankruptcy Court, the validity of Firstrust's mortgage is to be determined by the court (Order of January 19, 1990). The foreclosure action and this securities action have been consolidated for all purposes before this court (Order of May 2, 1990). Discovery has been stayed and Firstrust's motion for summary judgment on its foreclosure action has been dismissed without prejudice to refiling pending the outcome of this motion to dismiss (Order of August 23, 1990).

Based on the preceding alleged facts, plaintiffs complain that defendants made numerous omissions and misrepresentations of material facts to the plaintiffs in connection with the sale of limited partnership interests in Oceanaire Associates. For example, plaintiffs allege defendants concealed, among other things, that Firstrust was the motivating force behind the syndication; that Fifty–Three Hundred failed in its attempt to sell the property as individual condominium units; that Fifty–Three Hundred had defaulted on its obligations to Firstrust as a result; that revenues generated by the property as a motel were insufficient to pay the interest on the debt owed to Firstrust; that the property was purchased from Fifty–Three Hundred for $4,000,000 and then immediately sold to the partnership for $5,800,000; that the future foreclosure was inevitable and unavoidable and that, therefore, plaintiffs' securities were essentially worthless; and that the partnership would build no equity and provide no future profits nor tax benefits to the limited partners.

The court will now turn to the arguments to dismiss the specific counts of the complaint, starting with the alleged violations of the Racketeering Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968.

## II. DISCUSSION

On a motion to dismiss, the court must take as true the well-pleaded allegations in the complaint. *Miree v. DeKalb County*, 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 2492 n. 2, 53 L.Ed.2d 557 (1977); *Rogin v. Bensalem Township*, 616 F.2d 680, 685 (3rd Cir. 1980), *cert. denied* 450 U.S. 1029, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981). A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim which would entitle him or her to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-02, 2 L.Ed.2d 80 (1957). Motions to dismiss should be granted sparingly and only where the complaint discloses that plaintiff can not possibly prove a case entitling him or her to relief. *Sheppard v. American Dredging Co.*, 77 F.Supp. 73 (E.D.Pa.1948). "Reasonable factual inferences will be drawn to aid the pleader." *D.P. Enterprises, Inc. v. Bucks County Comm. College*, 725 F.2d 943, 944 (3rd Cir.1984).

### A. Statute of Limitations for Alleged RICO Claims

A threshold inquiry for this court is to determine whether plaintiffs have filed their RICO claims within the applicable statute of limitations. RICO itself does not contain a statute of limitations provision. The Supreme Court decided that the appropriate limitations period is four years from the time of a claim's accrual, analogizing to the Clayton Act's statute of limitations. *Agency Holding Corp. v. Malley–Duff & Assocs.*, 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). The Supreme Court expressly withheld opinion on when a claim accrues for RICO limitations purposes, thus leaving the lower courts to determine this issue. *Id.* at 156–57, 107 S.Ct. at 2767–68.

1. *The Rule of Keystone Insurance:* The Third Circuit had an opportunity to decide this issue in the case of *Keystone Ins. Co. v. Houghton*, 863 F.2d 1125 (1988). It announced the following rule:

> [T]he limitations period for a civil RICO claim runs from the date the plaintiff knew or should have known that the elements of the civil RICO cause of action existed unless, as a part of the same pattern of racketeering activity, there is further injury to the plaintiff or further predicate acts occur, in which case the accrual period shall run from the time when the plaintiff knew or should have known of the last injury or the last predicate act which is part of the same pattern of racketeering. The last predicate act need not have resulted in injury to the plaintiff but must be part of the same pattern. If the complaint was filed within four years of the last injury of the last predicate act, the plaintiff may recover for injuries caused by other predicate acts which occurred outside an earlier limitations period but which are part of the same "pattern."

*Id.* at 1130–31. The general rule announced by the Third Circuit requires plaintiffs to file civil RICO claims within four years from the date they knew or should have known that the elements of the civil RICO cause of action existed.[3] The exception to this rule allows plaintiffs to file a complaint within four years of the date they knew or should have known of the last injury or from the occurrence of the last predicate act. Such last injury or last predicate act, however, must arise from the same pattern of racketeering activities that gave rise to the RICO cause of action in the first place. The court fashioned this liberal approach to civil RICO claims in order to effectuate the primarily remedial purposes of the statute. *Id.* at 1131. *See*

*Keystone* at 1132. The complaint in this case, like *Barticheck v. Fidelity Union Bank,* 832 F.2d 36 (3rd Cir.1987), involves "the repetition of similar misrepresentations to more than twenty investors." *Id. quoting Barticheck* at 39. Plaintiffs allege multiple injuries to multiple victims, so *Keystone* applies.

---

**3.** Defendant Blank, Rome wrongly argues that the holding in *Keystone* is inapposite to this case and therefore should not apply. Defendant Blank, Rome's Reply Brief at 11. Although it may appear that this case involves only a single injury, in fact "the number of victims of a pattern of racketeering is an important factor in determining the existence of a RICO pattern."

**1378**

Shearson/American Express, Inc. v. McMahon, 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987); Sedima S.P.R.L. v. Imrex Co., 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985).

As the proper baseline for measuring when a civil RICO claim accrues, the *Keystone* court noted that the statute of limitations "may not begin to run until each of the elements of the cause of action exist." Thus, the "knew or should have known" standard of the discovery rule should be applied individually to: the pattern of racketeering (i.e. at least two predicate acts of sufficient continuity and relationship), the enterprise, the effect on interstate commerce and the injury elements of a civil RICO cause of action. *Keystone* at 1130. The court, in effect, extended the date of claim accrual by permitting plaintiffs time to file a complaint within four years of the *last* injury or *last* predicate act that is part of the pattern of racketeering. The purpose behind such an extension is to take account properly of the nature of the claim, which is remedying injury from a continuing or ongoing pattern of racketeering activities. *Id.* at 1131 (citations omitted). In other words, plaintiffs should not be barred merely because a predicate act or injury falls outside the limitations period as long as the last predicate act or last injury falls within the limitations period. *County of Cook v. Berger,* 648 F.Supp. 433, 435 (N.D. Ill.1986).

Plaintiffs fail to answer defendants' extensively briefed arguments that their complaint does not meet the requirements of the general rule stated above because the complaint was filed September 7, 1989, more than four years from the date they knew or should have known that there was an enterprise, a pattern, an effect on interstate commerce, and an injury. Rather, plaintiffs exclusively point us to the exception to the *Keystone* rule, which requires that we analyze the last injury or last predicate act that was part of the same pattern of racketeering activity. For reasons that will become more apparent in our analysis of *Keystone,* we agree with defendants that plaintiffs knew or should have known of the key elements of their RICO claims at the time they made their initial investments in Oceanaire Associates. Therefore, we proceed to examine the last injury or last predicate act rule.

*a. Last injury:* The RICO statute provides virtually no guidance on what a RICO injury is, other than to require, for purposes of standing, "injury to business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). The statute also gives successful plaintiffs the right to recover three times the damages they "sustain" from civil RICO violations. 18 U.S.C. § 1964(c). The Supreme Court held in *Sedima* that "the compensable injury necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern...." *Sedima* 473 U.S. at 497, 105 S.Ct. at 3285. Later in the same opinion, the Court described such harm as "financial loss." *Id.* at 500, 105 S.Ct. at 3287. Additionally, the Court noted that the plaintiff "can only recover to the extent that he has been injured in his business or property by the conduct constituting the violation." *Id.* at 496, 105 S.Ct. at 3285. Neither definition brings us much closer to a more specific understanding of a RICO injury for statute of limitations purposes.

■ As a general rule, plaintiffs may recover only the "damages flowing directly from the predicate acts." *See, e.g., Volk v. D.A. Davidson & Co.,* 816 F.2d 1406 (9th Cir.1987); *Haroco, Inc. v. American Nat'l Bank & Trust Co.,* 747 F.2d 384, 398 (7th Cir.1984), *aff'd* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985). Furthermore, the court can award only damages to business or property, and not for physical injury or mental suffering. *See, e.g., Cuzzupe v. Paparone Realty Co.,* 596 F.Supp. 988 (D.N.J.1984). But courts have reached different conclusions on the extent of damages recoverable in a civil RICO case depending on the facts of each case. *See, e.g., Fleischhauer v. Feltner,* 879 F.2d 1290 (6th Cir.1989), *cert. denied,* — U.S. ——, 110 S.Ct. 1122, 107 L.Ed.2d 1029 (1990) (investors' damages limited to amounts actually invested); *Carter v. Berger,* 777 F.2d 1173 (7th Cir.1985) (government may recover losses from underpay-

ment of taxes even though it may have already recouped loss); *Sound Video Unlimited, Inc. v. Video Shack, Inc.,* 700 F.Supp. 127 (S.D.N.Y.1988) (lost profits recoverable subject to limitations on speculativeness); *Heinold v. Perlstein,* 651 F.Supp. 1410 (E.D.Pa.1987) (lost expectation interest not sufficient injury to give standing under RICO). In *Fleischhauer,* a case similar to this one, the Sixth Circuit held that "plaintiffs's damages should be limited to the amounts actually invested." 879 F.2d at 1300; *accord Heinold v. Perlstein,* 651 F.Supp. at 412.

Furthermore, we note the Third Circuit's statement in *Keystone* that "[c]onceptually there is no requisite RICO 'injury' until the damage impacting the plaintiff becomes part of a pattern of racketeering activity. Prior to that point there is no RICO injury and the statute of limitations may not begin to accrue." *Keystone* at 1131. Therefore, for Rule 12(b)(6) purposes, the "last" injury that a plaintiff knows or should know about is the last injury that flows from the pattern of racketeering activity the plaintiff alleges in his or her complaint.

In order to answer the question when plaintiffs knew or should have known of their last RICO injury, we must determine when plaintiffs knew or should have known of the pattern of racketeering activities that caused the alleged RICO injury.[4] The Supreme Court held in *H.J. Inc. v. Northwestern Bell Telephone Co.,* — U.S. —, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), that "to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." 109 S.Ct. at 2900. Continuity is a "temporal concept" that reaches activities that amount to or threaten long-term criminal activity. *Id.*

■ In light of the mixed authority on defining RICO injury and the scope of recoverable damages, this court must rely on authority from other circuit and district courts. We believe that, reading the above

cases together and the rules and principles they enunciate, a reasonable definition of a RICO injury is the injury for which damages would be allowed if the plaintiffs were to prevail at trial. We agree with the Sixth Circuit's holding that, in a case such as this one where plaintiffs are amply warned of the speculative nature of any future profits, equity or tax benefits, expectancy damages are not recoverable. Therefore, plaintiffs in similar situations to those in *Fleischhauer* would only be able to recover the amount they actually invested.

The plaintiffs in *Fleischhauer* purchased non-theatrical distribution rights of 23 full-length feature films and television episodes. A jury found that defendants violated 18 U.S.C. § 1962(c) by committing wire and mail fraud in a scheme to defraud the plaintiff-investors and awarded damages. On review, the Sixth Circuit held that, in cases such as this, expectancy or "benefit of the bargain" damages were not available to plaintiffs. "The conduct of the defendants ... caused the parties to invest in the films but it did not cause the investment items to become less profitable than defendants represented.... There was ample warning about risks involved, particularly tax hazards, therefore, expectancy damages are not recoverable under these circumstances." *Fleischhauer* at 1300.

■ As applied to the facts of this case, we find that if plaintiffs were to succeed on their RICO claims, they could recover as RICO injuries only the amount they actually invested in Oceanaire Associates. Therefore, we conclude that plaintiffs' first and last recoverable injury caused by the pattern of racketeering activity which they allege on the face of their complaint occurred in August 1984, at the time they invested in Oceanaire Associates. Plaintiffs' complaint alleges a pattern of racketeering activity, principally wire and mail fraud, that began sometime in 1984 and continued until July 1985, when Firstrust filed proxy statements with the FDIC. By

---

**4.** This is required by the Third Circuit's holding in *Keystone* that "the discovery rule should be modified by applying the 'knew or should have

known' standard to *each* element of the cause of action...." *Keystone* at 1130.

that time, as plaintiffs' complaint amply illustrates in the RICO count, Complaint at ¶ 92, a pattern of racketeering activity of sufficient continuity and relationship existed of which plaintiffs knew or should have known.

Except for alleged predicate acts by Firstrust in 1984 and 1985, *all* of the acts of securities, wire and mail fraud that plaintiffs say added up to a pattern of racketeering activity occurred in connection with the formation of the limited partnership, the distribution of the Offering Memorandum and the sale of interests in the limited partnership. Complaint at ¶ 92(a–m). Almost all of these events took place in 1984, over four years after plaintiffs filed their complaint. All of the alleged acts of wire, mail and securities fraud occurred in connection with the sale of interests in Oceanaire Associates, which involved plaintiffs' knowing participation as interested and, eventually, actual investors. Each plaintiff was provided a voluminous Offering Memorandum that explained the venture in detail to potential investors for their consideration in deciding whether to invest. Furthermore, the Offering Memorandum is replete with warnings, some in full block letters, as to the highly risky nature of the venture, and the potential loss of tax benefits. Offering Memorandum at, *e.g.*, i, iv, vii, 5, 14–26, 69. In further demonstration of defendants' disclosure of risks and ample warnings to prospective investors, we note the following: The transaction was highly leveraged, Offering Memorandum at 15, 39; no permanent financing had been obtained, *id.* at 15–16; income from operations would not be sufficient to fund the balloon payment on either the existing loan or the purchase loan, *id.* at 16, 46; it would be necessary either to sell or refinance the property in order to fund the balloon payment on the existing loan in 1989 (or 1994, if extended), and on the purchase loan in 2005, *id.;* and failure to make the balloon payment when due on either the existing loan or the purchase loan could result in the loss of the property, and the limited partners' investments, *id.* at 15–17, 69. As to plaintiffs' complaint of defendants' failure to disclose Fifty–Three Hundred's un-

successful effort to sell the apartments as condominium units, an income statement attached to the Offering Memorandum prepared by a certified public accountant disclosed that "of the sixty-two units, seven were conveyed to third parties and the remaining fifty-five units were ... utilized for motel room units...." *Id.* at Exhibit I. These disclosures are more than enough to satisfy us that plaintiffs were on notice that the venture was a risky one. Finally, and most importantly, all of these alleged predicate acts took place over five years prior to September 7, 1989, the date plaintiffs filed this suit.

Plaintiffs contend that the last injury has not even occurred, i.e. the taking back of the property through Firstrust's impending foreclosure. They argue that the impending bankruptcy of Oceanaire Associates and the mortgage foreclosure will "likely" subject them to "additional, substantial damages, including adverse tax consequences." Complaint at ¶ 82. However, even if plaintiffs were to succeed in proving their RICO claims at trial, the rule we adopt today on expectancy damages under circumstances such as these would require us to limit damages (i.e. the RICO injury) to plaintiffs' lost investment. All other losses, e.g., future profits, build-up of equity and tax benefits, were merely speculative gains of which the plaintiffs were clearly and unequivocally advised before making their respective purchases. *See, e.g.*, Offering Memorandum at iv, vi (suitable investor "can bear the economic risk of losing his entire investment"). The only actual loss upon foreclosure is no more than the loss of their initial investment. According to plaintiffs' entire theory of the fraudulent scheme practiced on them, plaintiffs were induced to purchase "essentially worthless" investments. Complaint at ¶¶ 76(i, j), 78. Since that injury occurred in August 1984, plaintiffs had until August 1988 to monitor their investment and investigate any possible wrongdoing by defendants. A complaint filed five years from that date must be dismissed as time-barred.

In light of the disclosures in the Offering Memorandum, this court is not swayed by

plaintiffs' assertion that, because they were not aware and "by the exercise of reasonable diligence could not have become aware of the fraudulent and other wrongful conduct ... until on or about March 21, 1989, when they engaged counsel to investigate the underlying transactions," the limitations period should not run before then. The issue is not solely when plaintiffs learned of the fraud, but also when they *should* have learned of the fraud. Plaintiffs provide no explanation as to why, in the face of clear warnings of the highly risky nature of the venture, they waited over four years from the time they were allegedly induced to invest in Oceanaire Associates to engage counsel to investigate the matter.

*b. Last predicate act:* Under *Keystone,* our inquiry into whether plaintiffs are time-barred is not complete until we examine both the last injury and last predicate act arising from the same pattern of racketeering activity. If the last predicate act occurred any time after September 7, 1985, then plaintiffs are not time-barred.[5]

Plaintiffs need not allege each and every predicate act that is part of the pattern of racketeering activity. The Third Circuit in *Barticheck* found a complaint that pleaded only "two or more" acts of mail fraud in furtherance of defendants' alleged scheme sufficiently alleged a RICO pattern. "[I]t may fairly be inferred from the nature of the scheme that defendants engaged in considerably more than two such acts." *Barticheck* at 39. Therefore, this court is permitted to infer from plaintiffs' complaint what other acts of securities, mail and wire fraud may logically fall within the same pattern of racketeering activity in order to sufficiently put defendants on notice of what plaintiffs' claim is. *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 102–03, 2 L.Ed.2d 80 (1957) (a complaint must give defendant fair notice of what the plaintiff's

claim is and the grounds upon which it rests). However, if there is no predicate act as a matter of law, or if a predicate act could not fairly be inferred to give defendants proper notice, then it must not be considered in deciding when the last predicate act occurred for limitations purposes.

The RICO statute defines racketeering activity as acts "indictable" or "punishable" under various enumerated federal criminal statutes and as acts "chargeable" under various state criminal laws. 18 U.S.C. § 1961(1). Securities, wire and mail fraud are all included within this definition. Acts that do not meet this definition can not be considered acts of racketeering activity.

The last predicate act alleged on the face of plaintiffs' complaint took place in July 1985, at which time defendant Firstrust allegedly filed "false and misleading Proxy Statements with the FDIC ... in connection with Firstrust's conversion to a stock company." Complaint at ¶ 92(a). Since this act occurred more than four years before the filing of plaintiffs' complaint, and since plaintiffs knew or should have known that the pattern existed by August, 1984, plaintiffs' RICO claims are time-barred.

■ Although they did not allege so in their complaint, plaintiffs argue in their brief opposing the motion to dismiss that the last predicate act was the filing of Firstrust's mortgage foreclosure action on April 20, 1989, just four months before they filed their complaint. However, the commencement by a bank of a mortgage foreclosure action does not fall under RICO's statutory definition of racketeering activity, and therefore is not a predicate act. *See Meadow Ltd. Partnership v. Heritage Sav. & Loan,* 639 F.Supp. 643 (E.D. Va.1986). Furthermore, plaintiffs fail to

---

**5.** The discovery rule laid down in *Keystone* is limited to the last injury prong of the analysis, and not the last predicate act prong. As long as plaintiffs knew or should have known that at least two predicate acts causing injury were part of a pattern of racketeering activities at a certain point in time, it is unnecessary to apply the discovery rule to the last predicate act. Once

plaintiffs knew or should have known of the pattern, their RICO claim accrued from the date of the last predicate act. The *Keystone* last predicate act rule is meant to encompass those RICO claims in which the "second predicate act establishes the necessary pattern." *Keystone,* 863 F.2d at 1134.

allege any fraudulent acts directly associated with the foreclosure proceedings that might fall within the limitations period. Plaintiffs suggest we should imply such proceedings might be tainted by the underlying fraud associated with sale of the property in 1984, but that fraud falls outside the limitations period.

■ In the alternative, plaintiffs argue that Oceanaire's filing for bankruptcy on August 2, 1989 is a predicate act "since the bankruptcy and foreclosure are part of the ongoing fraudulent scheme, and Firstrust and other defendants undoubtedly utilized the mails and the wires in connection with these proceedings." Plaintiffs' Memorandum at 22 n. 16. Bankruptcy filing, like foreclosure, is not a predicate act, although "fraud connected with a case under title 11" is racketeering activity. 18 U.S.C. § 1961(1)(D). Plaintiffs' complaint, however, fails to allege any act of fraud associated with the bankruptcy filing. Furthermore, the entity that filed for bankruptcy, Oceanaire Associates, is not even named in the complaint; any fraud it may have committed can not be attributed to defendants. Finally, any legitimate efforts by Firstrust to intervene in the bankruptcy filing in order to defend its interests in the foreclosure action can not, as plaintiffs contend, "in and of themselves constitute predicate acts of racketeering activity." Such a conclusion would subject acts required as a matter of professional responsibility to potential liability. Plaintiffs' attempts to characterize every move on the part of defendants' litigation strategy as predicate acts must fail as a matter of law.[6]

We are left, therefore, with a complaint that fails to allege any predicate acts—as that term is defined by the RICO statute—after July 1985. Since that date falls outside the limitations period, plaintiffs' RICO claims are time-barred.

■ 2. *Fraudulent Concealment:* When a claim does not fall within the mandatory limitations period, plaintiffs may not be time-barred if the running of the statute of limitations has been tolled by fraudulent concealment on the part of defendants. *Armstrong v. McAlpin,* 699 F.2d 79, 89 (2d Cir.1983); *Rutledge v. Boston Woven Hose & Rubber Co.,* 576 F.2d 248, 250 (9th Cir. 1978); *Bethlehem Steel Corp. v. Fischbach and Moore, Inc.,* 641 F.Supp. 271 (E.D.Pa. 1986). The Supreme Court's analogy of civil RICO to the Clayton Act for statute of limitations purposes assures us that this is the correct approach. *See Agency Holding* at 483 U.S. 150–56, 107 S.Ct. at 2764–67.

■ Plaintiffs bear the burden of alleging the three elements of fraudulent concealment: (1) wrongful concealment of its cause of action by defendants; (2) failure of the plaintiffs to discover the operative facts or the basis of their cause of action within the limitations period; and (3) plaintiffs' due diligence until discovery of the facts. *Bethlehem Steel* at 273. A self-concealing conspiracy tolls the statute of limitations until such time as the plaintiff, through the exercise of diligence, becomes aware of the conspiracy. *Id.* at 274. "Silence or passive conduct of the defendants, however, is not deemed fraudulent, unless the relationship of the parties imposes a duty upon the defendant to make disclosure." *Rutledge* at 250.

Plaintiffs, in filing their complaint, acted on the assumption that their claim accrued within the limitations period, and therefore did not make any allegations of fraudulent concealment. Defendants ask the court to rule on the sufficiency of plaintiffs' fraudulent concealment without giving plaintiffs the benefit of amending their complaint for that purpose. We believe that, since plaintiffs in good faith did not allege fraudulent concealment and did not argue the point in their briefing papers, and since the evidence before us is not adequate to rule on this particular issue as a matter of law, plaintiffs should have the opportunity to amend their complaint accordingly. The court emphasizes, however, that plaintiffs

---

6. Plaintiffs' argument on this point is made even more disingenuous by the fact that plaintiffs themselves consented to Firstrust's attempts to seek relief from the automatic stay of § 362 in Bankruptcy Court. *See* Stipulation *In re: Oceanaire Associates,* Bky. No. 89–12799F, Jan. 18, 1990.

are allowed to amend their complaint only for the purpose of pleading fraudulent concealment.

**B.** *Statute of Limitations—Federal Securities Fraud Claims*

■ Count five of plaintiffs' complaint alleges violations of § 10 of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5. As with plaintiffs' RICO claims, the alleged violations occurred in connection with the sale by defendants of limited partnership interests in Oceanaire Associates on August 31, 1984. Defendants argue that the Third Circuit's holding in *In re Data Access Systems Securities Litigation*, 843 F.2d 1537 (in banc), *cert. denied sub nom. Vitiello v. Kaholowsky*, 488 U.S. 849, 109 S.Ct. 131, 102 L.Ed.2d 103 (1988), applies to bar plaintiffs' securities fraud claims on limitations grounds.

The Third Circuit in *Data Access* established that the limitations period applicable to § 10(b) and Rule 10b–5 claims was one year after plaintiffs discovered facts constituting the violation, and in no event more than three years after such violation. 843 F.2d at 1550. In that case, the Third Circuit reviewed recent Supreme Court pronouncements on the proper method for borrowing analogous limitations periods. *See Agency Holding Corp. v. Malley–Duff & Assocs., Inc.*, 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987), *Wilson v. Garcia*, 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985) and *DelCostello v. International Bhd. of Teamsters*, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). It then rejected this Court's determination that the analogous state common law fraud limitations period should apply. Instead, it looked to the analogous federal limitations period and concluded that the express limitations provisions of the Securities and Exchange Act of 1934 should apply.

A straightforward application of the *Data Access* rule to this case would require plaintiffs to have filed suit within one year from the time of discovery and in any event within three years from the time the violation occurred. Since the violation allegedly occurred in connection with the offering and sale of securities between June and August, 1984, and the complaint was not filed until September 7, 1989, plaintiffs are clearly time-barred. They must persuade the court, therefore, that the rule of *Data Access* should not be applied retroactively.

The question of retroactive application of the new one year/three year rule established by *Data Access* was not answered by the court on that occasion. The Third Circuit resolved that question in 1988 in the case of *Hill v. Equitable Trust Co.*, 851 F.2d 691, *cert. denied*, 488 U.S. 1008, 109 S.Ct. 791, 102 L.Ed.2d 782, (1989), and has considered it since in *McCarter v. Mitcham*, 883 F.2d 196 (1989), *Gatto v. Meridian Medical Associates, Inc.*, 882 F.2d 840 (1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1136, 107 L.Ed.2d 1041 (1990), and most recently in *Gruber v. Price Waterhouse*, 911 F.2d 960 (1990). The limitations period should be applied retroactively unless the party attempting to avoid retroactive application persuades the court that the rule should be applied prospectively only. *Hill*, 851 F.2d at 696–97. The method for applying the "uncommon exception" of prospective application of the *Data Access* rule requires a case-by-case analysis of the three-part test enunciated by the Supreme Court in *Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). *Id.*, at 697; *Gruber*, 911 F.2d at 964–65. These factors are premised on a general assumption that judicial decisions should be applied retroactively. *In re National Smelting of New Jersey, Inc.*, 722 F.Supp. 152, 157 (D.N.J.1989).

The three-part test of *Chevron Oil* states:

First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed. Second, it has been stressed that "we must ... weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and

whether retrospective operation will further or retard its operation." Finally, we have weighed the inequity imposed by retroactive application, for "[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis for avoiding the 'injustice or hardship' by a holding of nonretroactivity."

*Chevron Oil*, 404 U.S. at 106–07, 92 S.Ct. at 355 (citations omitted). In applying the first part, "[p]rior precedent must be 'sufficiently clear that a plaintiff could have reasonably relied upon it in delaying suit, a criteria that was not met where the law was erratic and inconsistent.' " *Hill*, 851 F.2d at 696, quoting *Fitzgerald v. Larson*, 769 F.2d 160, 163 (3rd Cir.1985). Although the court in *Hill*, *McCarter* and *Gatto* found that *Data Access* did not overrule clear past precedent which was sufficient to warrant justifiable reliance by plaintiff, the inquiry is "fact sensitive," requiring us to examine whether the facts of this case have been clearly decided in prior cases. *Gruber*, 911 F.2d at 965 (citations omitted). Therefore, we must examine the law as it existed at the time plaintiffs' cause of action arose and any changes which may have occurred prior to the time the complaint was filed. *Id.* at 965.

First, we must recognize the Third Circuit's "legal conclusion" that no clear precedent on the applicable New Jersey limitations period for Rule 10b–5 actions existed at the time *Data Access* was decided in 1988. *McCarter*, 883 F.2d at 203; *Gatto*, 882 F.2d at 843. In *Gatto*, plaintiffs were investors who purchased limited partnership interests in real estate as a tax shelter. They filed suit in 1987, alleging fraudulent inducement to purchase their limited partnership interests six years earlier in violation of § 10(b) and Rule 10b–5. They invoked Third Circuit precedent regarding limitations period under New Jersey law for § 10(b) and Rule 10b–5 claims as ground for prospective application of *Data Access*. The *Gatto* court rejected their argument on the basis that the *Hill* court found that no clear precedent existed at the time their cause of action arose as to the appropriate limitations period in New

Jersey for § 10(b) and Rule 10b–5 claims. *Gatto*, 882 F.2d at 843. Furthermore, *Data Access* did not resolve an issue of first impression. These conclusions were made as a matter of law. *Id.*

Plaintiffs in this case stand in an almost identical position to those in *Gatto*. At the time they purchased limited partnership interests in Oceanaire as a tax shelter in 1984, Third Circuit precedent regarding the New Jersey limitations period for 10b–5 violations brought by buyers against sellers of securities was no clearer than in 1981, when the claim in *Gatto* accrued. We must accept this as a matter of law and need not repeat the *Data Access*, *Hill* and *Gatto* courts' analysis of conflicting Circuit precedent on this issue. Plaintiffs' reliance on New Jersey *district court* cases applying the two-year discovery rule of New Jersey's Uniform Securities Act is misplaced because they do not reflect the uncertainty within the entire Third Circuit regarding which limitations period to apply.

Another important factor weighing against plaintiffs and on which they entirely fail to carry their burden is the *Gatto* court's analysis of justifiable reliance, which is an important element of the first *Chevron* factor. If plaintiffs could not know the significant operative facts underlying their cause of action until after the absolute bar period of *Data Access* had passed, they could not possibly have relied on a longer statute of limitations period. *Gatto*, 882 F.2d at 843. Here, plaintiffs allege in their complaint that "they did not become aware and by the exercise of reasonable diligence could not have become aware" of fraudulent conduct until they engaged counsel to investigate in March 1989. Complaint at ¶ 84. However, this was at least nineteen months after the three-year absolute bar of *Data Access* had lapsed. As long as plaintiffs were ignorant of their causes of action, they could not possibly have relied on any limitations period. Their argument, that once they discovered the fraud in 1989 they relied on the two-year discovery rule of the New Jersey blue sky law as interpreted by New Jersey district court cases pre-*Data Access*, ig-

nores the prevailing and by then settled one year/three year rule of *Data Access.* Therefore, we conclude that plaintiffs have failed to show that, as to their particular claim and the factual circumstances surrounding it, *Data Access* overruled clear past precedent on which they could have relied.

In a last-minute effort to persuade the court otherwise, plaintiffs draw our attention to Chief Judge Gerry's opinion in *In re National Smelting, supra.* In that case, Judge Gerry interpreted *Data Access* to mean that its one year/three year rule should not be applied retroactively when plaintiffs' claims would have been timely under both of the analogous state limitations periods. *In re National Smelting,* 722 F.Supp. at 158. "When this is the situation, we believe that *Data Access* is appropriately seen as overruling clear past precedent *upon which plaintiffs could have reasonably relied." Id.* (emphasis supplied). Plaintiffs argue that since their complaint would be timely filed under either the six-year New Jersey common law fraud limitations period or the two-year New Jersey blue sky statutory limitations period, the reasoning in *In re National Smelting* should apply. *In re National Smelting,* however, is easily distinguished from the facts of this case in that plaintiffs there showed that they reasonably relied on the clear past precedent of pre-*Data Access* cases. Here, because it is impossible that plaintiffs could have reasonably relied on precedent for a claim of which they were ignorant, they can not meet the first *Chevron* criterion, regardless of the ruling in *In re National Smelting.* Furthermore, Judge Gerry did not have the benefit of the Circuit's further guidance in *Gatto* and *Gruber* on this issue. Therefore, we feel confident that we have reached the correct result.

We now turn to the second criterion of the *Chevron* test. That component "requires a weighing of the 'merits and demerits of each case' to ascertain whether the retroactive operation would further or retard the rule." *Gruber,* 911 F.2d at 967. In every case in which the Third Circuit has considered the retroactivity of *Data Ac-*

*cess,* it has ruled that the second factor "does not 'militate clearly either in favor of or against retroactive application' and is therefore neutral." *McCarter,* 883 F.2d at 204, *quoting Al–Khazraji v. Saint Francis College,* 784 F.2d 505, 513 (3d Cir.1986), *aff'd,* 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1986). None of the parties have forwarded an argument to the contrary, and we see no reason not to rely on prior decisions finding the second criterion neutral.

Finally, the third criterion of *Chevron* requires that we examine the inequity to plaintiffs if retroactive application were given to *Data Access* in this case. As the Third Circuit noted in *Gatto,* "the third *Chevron* factor in practice overlaps with that of the first factor, 'in that it would be inequitable to give retrospective application to a shortening of the limitations period that altered established law upon which plaintiff could have reasonably relied.'" 882 F.2d at 844, *quoting Fitzgerald v. Larson,* 769 F.2d at 164. Once again we are faced with the fact that plaintiffs could not have reasonably relied on either the New Jersey general fraud or blue sky statute in delaying suit when they were totally ignorant of their claims until March, 1989, almost one year after *Data Access* laid down the one year/three year rule. Therefore, we conclude that no inequity could result on retroactive application of *Data Access.* Since plaintiffs have failed to satisfy the first and third factors of *Chevron,* and the second factor is neutral, we conclude that the rule of *Data Access* must be retroactively applied to bar plaintiffs' § 10(b) and Rule 10b–5 claims, and they are hereby dismissed.

## III. PENDENT JURISDICTION OVER REMAINING STATE CLAIMS

Since there is no diversity between parties, the sole basis of federal jurisdiction of this case is plaintiffs' allegations of RICO and § 10(b) violations. We have dismissed plaintiffs' RICO and § 10(b) claims on statute of limitations grounds. Such a result would compel us, under the doctrine of *United Mineworkers v. Gibbs,* to dismiss

**1386**

plaintiffs' pendent state law claims for lack of jurisdiction. 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Lovell v. Export–Import Bank of the U.S.*, 843 F.2d 725 (3rd Cir.1988) ("once all federal claims have been dropped from a case, the case simply does not belong in federal court.") (citations omitted).

However, we are granting plaintiffs additional time to amend their pleadings only to allege fraudulent concealment as to their RICO claims. Fraudulent concealment is not appropriate as to plaintiffs securities fraud claim because *Data Access* established an absolute bar of three years from the date the alleged violation occurred.

An appropriate order will be entered.

### ORDER

This matter having come before the court on defendants' motion to dismiss plaintiffs' complaint, pursuant to Rule 12(b)(6); and

The court having considered the submissions of the parties and their arguments at oral hearing; and

For reasons set forth in the opinion accompanying this order;

IT IS this 30th day of October, 1990 hereby

ORDERED that defendants' motion to dismiss the RICO and federal securities claim is GRANTED. It is further ORDERED that plaintiffs have fifteen (15) days from the date of this order in which to amend their pleadings to allege fraudulent concealment of their RICO claims. After timely responses from defendants, the court will rule on the fraudulent concealment issue and then determine whether federal jurisdiction remains over the pendent state law claims. It is further ORDERED that this court's stay of discovery of both the fraud and mortgage foreclosure cases pending the outcome of this motion to dismiss is hereby VACATED.